# MIDWAY COMPANY *v.* EATON.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 80. Argued December 4, 5, 1901.—Decided January 13, 1902.

Under the act of July 17, 1854, c. 83, 10 Stat. 304, Sioux half-breed certificates were issued to Orillie Stram, a female half-breed, authorizing her to select and take one hundred and sixty acres of the public lands of the United States, of the classes mentioned in said act. In June, 1883, she, through Eaton, her attorney in fact, applied at the local land office to locate the same on public lands of the United States, in that district, then unsurveyed, and filed a diagram of the desired lands sufficient to designate them. Those lands were not reserved by the Government. Subsequently they were surveyed, and the scrip was located upon them, and the locations were allowed, and certificates of entry were issued. In 1886, Orillie Stram and her husband conveyed seven ninths of the land to Eaton, the defendant in error. In 1889, an opposing claim to the land having been set up, the Secretary of the Interior held, for reasons stated in the opinion of this court in this case, that the opposing claimants had no valid claim to the lands; that the improvements made upon the land when it was unsurveyed, not having been made under the personal supervision of Orillie Stram, she had not had the personal contact with the land required by law; that the power given to Eaton to locate the land, and the power given to sell it, as they operated as an assignment of the scrip, were in violation of the act of July 17, 1854, and that it followed that the entry of the lands was not for the benefit of Orillie Stram; that the location and adjustment of the scrip to the lands were ineffectual; that Orillie Stram had no power to alienate or contract for the alienation of the lands, before location of the scrip, and that the lands were still public lands and open to entry. This was an action to quiet the title, the plaintiff in error claiming adversely to Eaton. The scrip locations were adjudged by the district court and by the Supreme Court of the State of Minnesota to be valid. This court sustains that judgment.

THIS is an action to quiet title, and was brought in the district court in the eleventh judicial district, county of St. Louis, State of Minnesota.

The plaintiff in error claims title under a United States patent issued to its grantor, one Frank Hicks, upon a homestead settlement. The defendants in error claim under locations of what is commonly known as "Sioux half-breed scrip," issued under

the act of July 17, 1854, c. 83, 10 Stat. 304. These locations, it is alleged, were prior in time and right to the claim of Hicks, and therefore the patent was illegally issued to Hicks. It was prayed that the title represented by the patent be adjudged to be held in trust for the defendants in error, and that the plaintiff in error be required to convey such title to them in proportion to their interests set forth in their cross bill.

The controversy turns upon the validity of the scrip locations. Their validity was adjudged by the district court, and by the Supreme Court of the State. 79 Minnesota, 442. This writ of error was then sued out.

The facts as found by the court are: That under the act of July 17, 1854, and in pursuance of said act, there were issued to Orillie Moreau certificates commonly known as Sioux half-breed scrip numbered 19E and 19D, which entitled her to select and take one hundred and sixty acres of the public lands of the United States of the classes mentioned in said act; " that thereafter, and on the 16th day of June, A. D. 1883, the said Orillie Moreau, then Orillie Stram, never having theretofore made use of the said certificates of scrip, and the same never having been in any manner extinguished or satisfied, through the defendant Frank W. Eaton, who had theretofore been by her duly empowered as her attorney in fact for that purpose, presented said scrip at the local land office in Duluth, Minnesota, and then and there made application to locate the same on certain then unsurveyed lands of the United States in said district in which said land office was located, and did then and there enter and file upon by virtue of said scrip the lands for which said application was made as aforesaid, and filed therewith a diagram or plat of said land embracing a sufficient description thereof to properly designate the same, which lands were in said application described by metes and bounds ; " and that the same were " lands not reserved by the Government of the United States for any purpose whatsoever ; " and also that " prior to the location of said scrip upon said land as above found improvements had been made thereon, consisting of a house 14 by 16 feet, by and under the authority of the said Frank W. Eaton."

On the 20th of July, 1885, the lands having been duly sur-

veyed, a plat and survey of the township in which the lands were situated were "duly filed in the local land office at the city of Duluth, Minnesota, and thereupon and on the 21st day of July, 1885, upon application of the said Orillie Stram, acting by and through her said attorney in fact, said certificate of Sioux half-breed scrip number 19D was adjusted to and upon the lands in controversy," (they were specifically described,) and the scrip was then and there duly located upon said lands as surveyed lands, and the locations were allowed by the officers of the local land office at Duluth, there not being at that time nor at the time the scrip was located upon the lands when unsurveyed, nor at any other time, any valid adverse claim to said lands; and on the 21st of July, 1885, receiver's final receipts and certificates of entry were duly and regularly issued to said Orillie Stram, and duly and regularly recorded in the counties of Lake and St. Louis, Minnesota, within a few days thereafter.

The "rights and interests" of Orillie Stram, by sundry mesne conveyances, were conveyed to the defendants in the proportions respectively as follows: "Frank W. Eaton, the undivided 13–36; Merrill M. Clark, the undivided 9–36; Margaretha Lonstorf, the undivided 8–36, and Richard H. Fagan, the undivided 6–36, and the said defendants are still the owners of the said lands in said proportions."

That on the 20th of July, 1885, one Thomas Hyde and one Angus McDonald respectively made application to make preemption filings on portions of the lands in controversy, which applications were denied both on the ground of the prior locations of the scrip and that the applications were not made in good faith, but in fraud, and in violation of the preëmption laws. And it was determined by the local land office and sustained by the Commissioner of the General Land Office, and by the Secretary of the Interior, that neither Hyde nor McDonald ever had or obtained any rights whatsoever by reason of their application or any subsequent proceedings; but, notwithstanding, said Hyde and said McDonald "made an attack upon the said decisions of the Land Department some time in November, 1885, and upon the location of the said certificates

of scrip and the entry of lands thereunder." A hearing was had on the 6th of April, 1886, and the local land officers sustained the scrip locations. An appeal was taken to the Commissioner of the General Land Office, and he held "adversely to the scrip locations." An appeal was then taken to the Secretary of the Interior. A hearing was had before the Secretary, February 18, 1889, and he held and determined that neither Hyde nor McDonald had any interest or valid claim to the lands, but, notwithstanding, also held that the scrip locations were illegal and invalid, and that neither Orillie Stram nor those claiming under her were entitled to the lands for the following reasons: (1) that the improvements made upon the land when it was unsurveyed were not made under the personal supervision of Orillie Stram, and that she had not had personal contact with the land; (2) that the power of attorney to Eaton to locate the scrip, and the power of attorney executed at the same time to Leonidas Merritt to sell the lands which should be located, operated as an assignment of the scrip, and were in violation of the act of July 17, 1854, and the entry of the lands therefore was not for the benefit of said Orillie Stram; (3) that the subsequent location and adjustment of the scrip to the lands after the latter were surveyed were ineffectual in view of the previous attempt to locate the scrip, and in view of his (the Secretary's) decision relative to the question of improvements; (4) that Orillie Stram had no power to alienate the lands before location of the scrip or to contract for the sale of them, or to grant a power of attorney to sell the same for her after they should be located, but held that she had the right to sell immediately after location of the scrip. As a deduction from these conclusions, the Secretary held that the lands were still public lands and open to entry. The decision of the Secretary was attached to the findings as an exhibit.

That on the 31st day of March, 1886, and prior to the hearing had before the local land office at Duluth, the said Orillie Stram and her husband Roman Stram made and executed a deed for seven ninths of the land in controversy to Frank W. Eaton, with warranty of title. The deed was subsequently recorded in St. Louis and Lake counties.

· The deed recited the location of the scrip in the land office at Duluth, June 16, 1883, by Eaton, as the constituted and appointed attorney in fact of the Strams, and that the title thereby vested in Orillie Stram. It also recited the survey of the lands and the adjustment of the scrip and entry to such lands, and " thereby the aforesaid scrip and entry were adjusted July 21, A. D. 1885, thereby specifically and perfectly describing the land filed upon for me, the said Orillie Stram, by the said Frank W. Eaton, and intended to be entered on June 15, A. D. 1883, in the name of the said Orillie Stram, by our attorney in fact, the said Frank W. Eaton." It also recited the power of attorney given to Leonidas Merritt, acknowledged it, and ratified and confirmed the conveyance by him to Eaton.

It was further found that in pursuance of the decision of the Secretary of the Interior the lands were attempted to be thrown open to public entry, and a patent was subsequently issued to Frank Hicks, and that Frank Hicks and his wife conveyed the same to The Midway Company, the plaintiff in error, " who now holds whatever title thereto enured to the said Frank Hicks." That neither Orillie Stram nor her husband, nor any of the defendants, " were in any manner parties to the proceedings to the decision of the Secretary of the Interior rendered on the 18th of February, 1889, and that said Hicks had at all times full knowledge of all rights and claims of the defendants." That the findings of fact of the Secretary of the Interior were fully sustained by the evidence in the cause presented to him, " except that it is found as a fact by this court, that the improvements caused to be erected by Frank W. Eaton upon the said premises consisted of a house about 14 by 16 feet in size ; and it is further found as a fact that from the evidence before the Secretary of the Interior in said cause, presented to him by the record upon said appeal, it did not appear that the scrip referred to in the decision of said Secretary had passed through many hands or through any hands before coming into the hands of the said Frank W. Eaton, nor did it appear that the powers of attorney to locate said scrip and to convey the land located therewith had been executed by the said Orillie Stram years before the location thereof by the said Frank W. Eaton, but that

on the contrary it appeared from the evidence before the Secretary that said powers of attorney were executed by the said Orillie Stram about one week before the location of the said scrip by the said Frank W. Eaton, and that the said powers did not contain the names of the grantees. It is further found as a fact that it did not appear from the evidence before the said Secretary that the said Orillie Stram never saw the said lands; it did not appear from the evidence before the said Secretary that she had sold the said scrip long prior to the location thereof; it did not appear from the evidence before the said Secretary that for a long time she directly and positively repudiated Eaton and Merritt as her attorneys in fact, denying that they acted for her in any capacity whatsoever."

*Mr. Walter Ayers* for plaintiff in error. *Mr. P. H. Seymour* was on his brief.

*Mr. Jed. L. Washburn* and *Mr. Luther C. Harris* for defendants in error. *Mr. C. A. Towne* and *Mr. William D. Bailey* were on their briefs.

MR. JUSTICE MCKENNA, after stating the case, delivered the opinion of the court.

The decision of the controversies in this case depends upon the validity or invalidity of the scrip locations, either originally when the land was unsurveyed, or subsequently when the location was adjusted to the land as surveyed.

The act of Congress of July 17, 1854, c. 83, 10 Stat. 304, authorized the issue of scrip to the half-breeds of the Sioux Nation of Indians in exchange for certain lands, which scrip might be located (1) upon any land within the Sioux half-breed reservation; or (2) "upon any other unoccupied lands subject to preemption or private sale;" or (3) "upon any other unsurveyed lands not reserved by the Government, upon which they (the half-breeds) have respectively made improvements. It is provided in said act, "That no transfer or conveyance of any of said certificates or scrip issued shall be valid."

On the latter provision of the act the plaintiff in error bases the contention that the scrip is not assignable, and that the power of location is strictly personal to the Indian, and must be made whether on surveyed or unsurveyed land, either by him or for his benefit, and that the improvements on unsurveyed land must be made under his personal supervision and direction; that he must come in personal contact with the land. And it is hence asserted that the powers of attorney given to Eaton and Merritt were virtual assignments of the scrip and frauds upon the act of Congress; that the improvements were made not by Orillie Stram, the half-breed, or for her benefit, but by Eaton and for his benefit; and that the subsequent adjustment of the locations of the land after its survey was made for him, not for her; for his benefit, not for hers. On the other hand, the defendants in error contend that the prohibition against the assignment of the scrip is strictly of the scrip as such, not of the rights or powers conferred by it: that the provision of the statute is not a prohibition upon the alienation of the land, but is intended to protect the Government against controversies about the transfer of the scrip, and to require and secure all of the steps and proceedings to be in the name of the Indian and the title to be issued in his name. It is claimed, therefore, that the requirements of the statute have been observed; that the locations were made in the name of the Indian, and for her benefit. And it is also claimed that if there was any defect in the location upon the land when unsurveyed, by reason of the insufficiency of the improvements or by whom erected, that defect was supplied by the location of the scrip after the land was surveyed, and the acceptance of the location of the scrip by the local land office, there being then no adverse rights to the land. And further, that the power of Eaton to make the location for the Indian was ratified by her (if it needed ratification), and all rights which enured to her were conveyed by her warranty deed to Eaton.

These contentions exhibit the controversy between the parties and present the only questions upon which we think it is necessary to pass, and the questions are certainly close ones. The Interior Department has not always given the same answer to

them, and the latest decision of that Department is opposed in the case at bar by the courts of Minnesota.

It is natural to respect the rulings of the Land Department upon any statute affecting the public domain, and if the rulings were contemporaneous with the enactment of the statute they afford a somewhat confident presumption of its meaning. One of the reasons is that the officers of the Land Department may have recommended the statute—indeed, may have written its words or, at any rate, were familiar with the circumstances which induced the legislation. We have not, however, in the case at bar, an exactly contemporaneous construction of the act of 1854 by the Land Department. The first circular of instructions was not issued until March 21, 1857. It is, however, not without value, and it tends to the support of the contentions of the defendants in error. The circular stated that the scrip " must be located in the name of the party in whose favor the scrip is issued, and the location may be made by him or her in person, or by his or her guardian." And further : " You will observe that this scrip is *not assignable,* transfers of the same being held void ; consequently, each certificate, as hereinbefore stated, can only be located in the name of the half-breed ; and such certificate or scrip are not to be treated as money, but located acre for acre."

In the circular issued February 22, 1864, those instructions were repeated, and the following added : " When not located by the reservee in proper person, the application to locate must be accompanied by the affidavit of the agent that the reservee is living, and that the location is made for the sole use and benefit of said reservee." Prior to the issuance of the circular of February 22, 1864, to wit, in 1863, a contest came on appeal to the Land Department, between a location made by Sioux scrip which was issued to one Sophia Felix, and a claim under a pre-emption settlement. The Commissioner of the Land Department decided against the scrip location on two grounds, one of which was: " That ' the location of the scrip, although made in her name, was not made by her in person, nor by her guardian or duly authorized agent, for her use and benefit, but by

an unauthorized person, and for the use and benefit of a person having no legal interest therein.'"

The decision was reversed by the Secretary of the Interior, who stated, through Otto, Assistant Secretary:

"As to your second objection, I remark that this kind of scrip is by the law declared to be not assignable. In this case Sophia Felix has signed the application to locate her own scrip. The signature must be treated by us as genuine, when there is no proof to the contrary; and when she has made no complaint against this use of her scrip. The fact that the scrip was carried to the land office and the business transacted by another person, does not affect the validity of her entry of the land.

"As the certificate of location issued in her name, and the patent will issue to her, neither the register's report nor the affidavits of third parties can be admitted to establish the interest of any other person in the location.

"We could not recognize such interest if an assignment in writing was produced and duly proven to have been executed by the half-breed—whether she could sell or did sell the land after the location of her scrip we need not inquire, and the validity and effect of any such sale or assignment must be left to the arbitrament of the courts of law. The location is valid on its face, and the owner of the scrip, so far as she is represented at all, demands the patent to issue in her name, and my decision is that she is entitled thereto."

In 1872 a special circular was issued (1 C. L. L. 723), which contained the following direction:

"That the application must be accompanied with the affidavit of the Indian, or other evidence that the land contains improvements made by or under the personal supervision or direction of said Indian, giving a detailed description of said improvements, and that they are for his personal use and benefit; in other words, you should be satisfied that the Indian has a direct connection with the land and is claiming the same for his personal use. Unless such evidence is filed, you will reject the application."

In 1878 a new circular was issued which repeated the pro-

visions of the circulars of 1864 and 1872, above quoted. (2 C. L. L. 1355 ; 5 C. L. O. 126.)

Then came the decision of the Secretary of the Interior, Vilas, in *Allen et al.* v. *Merrill et al.,* 8 L. D. 207, and in *Hyde and McDonald* and *Eaton and Stram.* They were affirmed on review by Secretary Noble. · Those cases laid down the propositions upon which plaintiff in error relies in the case at bar. Between the decision in those cases and that in the *Felix* case there was an interval of thirty years, and pending that interval there were decisions of the courts which took the same view as Secretary Otto expressed in the *Felix* case.

In *Gilbert* v. *Thompson,* 14 Minnesota, 544, a conflict of titles was presented based upon deeds from one Amelia Monette, a Sioux half-breed. The action was ejectment, and the deed, which plaintiff relied on, was executed by Amelia in person May 29, 1867 ; the deed upon which defendant depended was executed by her attorney in fact, Benjamin Lawrence, July 18, 1857, under a power of attorney dated May 27, 1857. The power of attorney authorized Lawrence to act for Amelia as follows :

" For me and in my name to enter into and take possession of all the real estate belonging to me, or of which I may hereafter become seized, situated in the county of Wabasha, in the Territory of Minnesota ; and for me to lease, bargain, sell, grant and confirm the whole or any part thereof ; . . . and for me and in my name to make, acknowledge and deliver unto the purchaser, or purchasers, good and sufficient conveyances."

Affirming the judgment which passed for defendant, the Supreme Court of the State said by Chief Justice Gilfillan :

" The act of Congress of 1854, under which Sioux half-breed scrip was issued, provides ' that no transfer or conveyance of any of said certificates or scrip shall be valid.'

" It was the intention of Congress that the right to acquire public lands by means of this scrip should be a personal right, in the one to whom the scrip issued, and not property in the sense of being assignable ; but no restraint is imposed upon the right of property in the land after it is acquired by location of the scrip. In the scrip itself, the half-breed had nothing which

he could transfer to another; but his title to the land, when perfected under it, was as absolute as though acquired in any other way. It follows, therefore, that any attempt to transfer the scrip, directly or indirectly, would be of no effect as a transfer. The title to the scrip would remain in him, and the title to the land acquired by it would vest in him, just as though no such attempt had been made. Such attempt to transfer would not involve any moral turpitude nor the breach of any legal duty, as is the case with an attempt to transfer a preëmptive right. It would be simply ineffectual, because the scrip is not transferable.

"A power of attorney, so far as it intended to operate as a transfer, would be of no avail; the right of the half-breed in the scrip and land would remain the same; it could not be made irrevocable, nor create any interest in the attorney. Should the attorney sell under it, he would be accountable to his principal, precisely as in the case of any power to sell; but a simple power to sell, executed by a half-breed, is good till revoked, and would extend to lands subsequently acquired by means of scrip, if such lands came within its terms. We think such a power could not be varied by parol proof that the parties had an intention not expressed in it, even to defeat the power, except on the same grounds as would admit such proof in other cases. The intent to transfer the scrip not being illegal, but only ineffectual, could not affect the power where not expressed in the same instrument, or in one equal in degree, as evidence. Whether the power to sell would be upheld in an instrument, upon its face a transfer, the former being only incidental, we do not decide."

*Gilbert* v. *Thompson* was affirmed and applied in *Thompson* v. *Myrick*, 20 Minnesota, 205. The latter case came to this court, 99 U. S. 291, and its doctrine was approved. The suit was for specific performance. Thompson, who was plaintiff in the court below, was in occupation of the land to which he was desirous of obtaining title. Myrick was "attorney in fact (duly constituted) of Francis Longie and Joseph Longie, his son, then a minor under the age of fourteen years, and of Francis Roi and Henry Roi, his son, then a minor under the age of fourteen

years, and was duly authorized to locate certain half-breed scrip issued to said Joseph and Henry in accordance with the provisions of the act of Congress approved July 17, 1854."

With a view to the location of the scrip for the benefit of the beneficiaries, Myrick placed the same with powers of attorney in the hands of Thompson, and at the same time entered into a written agreement with Thompson, in which he agreed that upon the location of the scrip he would secure the title to the land located to be lawfully vested in Thompson. The consideration was $2800, evidenced by a note payable in one year from its date, and to be secured upon the land as soon as Thompson should acquire title. Thompson located the scrip and demanded a conveyance of the title. Myrick refused, and conveyed the land to his wife, who was also a defendant in the suit. Specific performance was decreed by the trial court, and the decree was affirmed by the Supreme Court of the State. Among other defences it was urged that the agreement between Myrick and Thompson was void as contravening the act of Congress of July 17, 1854. To the contention the Supreme Court of the State replied : " As to the point that the real object of the contract was to accomplish a transfer of the scrip, we see nothing to distinguish this case in any important respect from *Gilbert* v. *Thompson*, 14 Minnesota, 544."

And further, in answer to the contention that the agreement was void on common law grounds by reason of the relations of Myrick to the grantees of the scrip, the court said : " As the scrip was made non-assignable by the act of Congress, (10 Stat. 304,) and therefore no valid transfer or conveyance of the same could be made, Myrick's relation to the scripees was that of an attorney in fact, duly authorized to locate the scrip for them. . . . As this relation was to end upon such location, we can conceive of no reason why Myrick was not at liberty, either before or after the location was made, to enter into an agreement to secure the title (enuring from the location) to the plaintiff upon payment of an agreed consideration. Such an agreement did not, so far as this case shows, tend to produce a conflict between Myrick's private interest and his duty to *locate* the scrip to the best advantage of his principals."

These defences were reviewed by this court, and, commenting on them, it was said by Mr. Justice Clifford:

"Attempt it seems was made in the argument of the case in the Supreme Court of the State to show that the terms of the agreement were in conflict with the provisions of the act of Congress; but the answer which that court made to the proposition, though brief, is satisfactory and decisive."

And further:

"Holders of such certificates or scrip were forbidden to transfer the same, and the defendants contended that the real object of the agreement was to effect a transfer of the same; but the state Supreme Court overruled the defence, and referred to one of their former decisions, assigning the reasons for their conclusion that the defence was not well founded. *Gilbert et. al.* v. *Thompson*, 14 Minnesota, 544.

"Since the case was submitted, the opinion of the court in the case has been carefully examined, and the court here concurs with the state court that the case is applicable to the present case, and that the reasons given for the conclusion are satisfactory and conclusive. For these reasons the court is of the opinion that the Federal questions involved in the record as set forth in the assignment of errors were decided correctly by the state Supreme Court."

Secretary Vilas, in passing on the validity of the location in the present litigation, in effect disagreed with the decision in *Gilbert* v. *Thompson*, and expressed the view that "all the documents, *besides* any parol additions [the italics are ours], are to be taken together to ascertain what in effect the agreement was, and it will be judged according to its nature as so ascertained;" and applying this rule, he considered that the transaction between Stram and Eaton was tantamount to a direct sale and transfer of the scrip, accompanied by the declaration that "to circumvent the statutory prohibition" two letters of attorney have been executed in blank, the one to locate the scrip and the other to convey the land when the scrip shall be located, and an agreement that by whomsoever the letters of attorney may be executed no claim will be made by the Indian to the scrip or land. And he concluded that if letters of at-

torney accompanying such a document would be invalid, the powers of attorney to Eaton and Merrill constituted " a part. of a transaction which cannot be supported in law." Secretary Noble considered the case more at length, and said: " The controlling points in the case, as decided by the court, plainly were (1) that a simple power to sell, executed by a half-breed, such as the one there considered, would extend to lands subsequently acquired by means of scrip if within its terms; and (2) that parol proof of an intent coincident with the creation of the power to transfer the scrip, could not be received to defeat the power."

The first point was not controverted, and of the second it was said that, as a rule of evidence, it might properly be enforced in controversies between individual claimants, but that it did not apply " against the Government, whose interest it is, before it parts with its title, to see that the law has been faithfully complied with."

The learned Secretary regarded *Gilbert* v. *Thompson* as turning upon a rule of evidence, and that the court did not·pass upon the question which he was considering, and this, he said, was " clearly shown by their statement that 'we do not decide' whether a power to sell contained in an instrument, on its face a transfer, the power being merely incidental to the transfer, would be upheld. That is the question here—the only difference being the manner of its presentation. It properly arises here on the record; in *Gilbert* v. *Thompson* it did not, the evidence of the transfer being excluded on technical grounds, and therefore it was not decided." And he observed that *Thompson* v. *Myrick* went no further, and was " in fact ruled on in *Gilbert* v. *Thompson* by the state·court, and that rule was affirmed by the Supreme Court (this court) on appeal."

We do not think those cases were as confined as represented. It is very evident that the courts did not think that " parol additions" could unite and make single the documents, or, when thus united, they constituted a violation of the statute. And it is a deduction from the opinions that it was not the manner of proof but the substance of what was proved or to be proved, that was passed upon. If evidence was excluded in *Gilbert* v. *Thompson*, it was admitted and considered in *Thompson* v.·

*Myrick*, and in both cases the delivery of scrip and its location under letters of attorney were decided to be valid, forming in one case a good title and in the other constituting a ground for a compulsory conveyance from the half-breed. The moral and legal effect of the transfer of scrip was declared by the court in *Gilbert* v. *Thompson*. The first involved, the court said, no "turpitude nor the breach of any legal duty, as in the case of an attempt to transfer a preëmption right;" of the second, it was said, it would be of no effect as a transfer; that "the title to the scrip would remain in him (the half-breed), and the title to the land covered by it would vest in him (the half-breed) just as though no such attempt had been made." The power of attorney, however, was given full legal effect as authority to sell the land located. It is true the court excluded parol evidence of an intention to transfer the scrip. But why? Manifestly because the transactions did not constitute a transfer of the scrip as such, and their legal character could not be destroyed by parol proof that they were intended to be something else. In other words, the court decided that the transactions were intended as a conveyance of the land and represented that intention, and could not be shown to be a transfer of the scrip. And in *Thompson* v. *Myrick* the court observed: "We can conceive of no reason why Myrick was not at liberty, either before or after location was made, to enter into an agreement to secure the title (enuring from the location) to the plaintiff upon the payment of an agreed consideration." The reasoning and the conclusions of the Supreme Court of Minnesota were approved by this court, as we have seen.

The consideration of the location of scrip under the act of 1854 came before this court again in *Felix* v. *Patrick*, 145 U. S. 317. It is a good complement to the other cases. It recognized, as they did, the difference between the transfer of the scrip itself and its location by or in the name of the half-breed as a means of conveying the land located upon. There are expressions in the opinion that seem to go further, but they must be considered in reference to the facts. It was said: "The device of a blank power of attorney and quitclaim deed was doubtless resorted to for the purpose of evading the provision

of the act of Congress that no transfer or conveyance of the scrip issued under such act should be valid. This rendered it necessary that the scrip should be located in the name and for the benefit of the person to whom it was issued, but from the moment the scrip was located and the title in the land vested in Sophia Felix, it became subject to her disposition precisely as any other land would be. In order, therefore, for the purchaser of this scrip from Sophia Felix to make the same available, it became necessary to secure a power of attorney or a deed of the land, and as the scrip had not then been located, and the person who should locate it was unknown, the name of the grantee and the description of the land must necessarily be left in blank."

And again: " As the bill alleges that Patrick obtained possession of these instruments while still in blank, he is clearly chargeable with notice that they were intended as a device to evade the law against the assignment of scrip."

Felix was a half-breed to whom scrip had been regularly issued. It was obtained from her by some person unknown, " by wicked devices and fraudulent means;" the power of attorney omitted the name of the attorney, the number of the scrip and the description of the land. The quitclaim deed also omitted the name of the grantee and the description of the land; otherwise the instruments were in legal form. The transaction was held to be a fraud upon Felix, and Patrick was adjudged to hold the title he obtained by the location of her scrip and the deed to him, as trustee for her. The court made no question of the validity of the location. Indeed, it was necessarily assumed, and the half-breed given the benefit of it. It may be said that neither of the litigants was concerned to dispute the location or to assert the provision of the act of Congress prohibiting the transfer of the scrip. If so, that provision from the point of view of the case at bar was not in judgment, and the expression in regard to it must therefore be strictly confined to the facts and the issue which was presented.

This brings us to the consideration of the amount and kind of improvements required by the act of 1854 to be erected up-

on unsurveyed land.   The act is not explicit.   It does not define the extent or kind of improvements.   It permits a location to be made upon "unoccupied land . . . upon which they (half-breeds) have respectively made improvements." Residence is not required, either initial or subsequent, temporary or continuous.   The purpose of the provision of the statute would seem, therefore, necessarily to be identification, notice of appropriation, and the kind and extent of improvements only to be necessary for that.   But we may concede, as held by Secretary Noble, "that the requirement of improvements must have some substantial significance," and "it is not satisfied by doing something which is a betterment of the land, but of too slight a character to mark anything more than a pretext of compliance."   The improvements erected on the land in controversy satisfied the rule whether they were as, it is claimed, Secretary Vilas found, or were as the trial court found in the present case.

It is further urged that the improvements were not erected for the benefit of the Indian nor did she have "a direct connection with the land," and that those requirements are made conditions precedent to a valid location by the circulars of the land office issued in 1872 and subsequently.

1. It was decided in *Thompson* v. *Myrick, supra,* that a valid location could be made by an attorney in fact of the Indian, and that he could, "either before or after the location was made," enter into an agreement to secure or convey the title. That case was affirmed by this court, and the facts of the case at bar bring it within the ruling.

2. To consider the act of 1854 as requiring its beneficiaries to have "a direct connection with the land and claim the same for his personal use," would lead to great embarrassment, if not to discrimination, between the beneficiaries.   The effect of that construction was expressed by the Supreme Court of the State as follows:

"Under the law the President was authorized to do what was actually done, issue to each person entitled several pieces of scrip of different sizes or acreage.   Was it expected that each of these persons should be personally connected with the sev-

eral and separate improvements required to be made if all of the pieces were located on unsurveyed lands, and would have to claim the same for personal use? Surely not. This law contemplated and there were actually issued several pieces of scrip to each of a large number of minors. Babes in arms were held to be entitled and to them scrip was issued, and in many cases located before the minors reached majority, as might reasonably be expected. With these facts before us can it be held that Congress thought or intended that these minors would be required by a construction of the law to personally supervise the selection of from three to five tracts of land on which to locate their pieces of scrip, or that they would have to be directly connected with each of these locations, or in case unsurveyed lands were desired they would have to claim the necessary improvements as their own?"

It is impossible to escape the force of these observations and to accept a construction of the statute which has the consequences expressed. Upon the other points discussed by counsel we do not consider it necessary to pass.

*Judgment affirmed.*