SWITZERLAND COMPANY, a corporation, and Joseph H. Walker, Appellants,

v.

Stewart L. UDALL, Conrad Wirth, and Sam P. Weems, Appellees.

No. 9385.

United States Court of Appeals Fourth Circuit.

Argued June 12, 1964.

Decided Sept. 30, 1964.

Guy T. Carswell and James F. Justice, Charlotte, N. C., (Francis O. Clarkson, Jr., Carswell & Justice, and Craighill, Rendleman & Clarkson, Charlotte, N. C., on brief), for appellants.

Richard N. Countiss, Atty., Dept. of Justice, and William Medford, U. S. Atty. (Ramsey Clark, Asst. Atty. Gen., and Roger P. Marquis, Atty., Dept. of Justice, on brief) for appellees.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and HEMPHILL, District Judge.

HAYNSWORTH, Circuit Judge.

Concluding that this was an action against the United States to which it had not consented, the District Court dismissed this action brought nominally against three individuals who occupy the offices, respectively, of the Secretary of the Interior, the Director of the National Park Service and the Superintendent of the Blue Ridge Parkway. The relief sought by the plaintiffs is a compulsory removal of obstructions, deliberately erected by employees of the National Park Service, of a road, and the continuing maintenance of access over that road, to the Blue Ridge Parkway. We agree with the District Judge that this action for injunctive relief is not maintainable.

In 1909, the plaintiff, Switzerland Company, acquired a tract of some 1200 acres lying along the crest of the Blue Ridge Mountains, portions of which it proceeded to subdivide and develop as sites for summer residences. Some roads were laid out, and sometime later a stone tower, known as Kilmichael Tower, was constructed to provide residents and visitors with an unobstructed 360° view of the mountain scenery of the area. A

road, ten feet in width, was constructed, running between Kilmichael Tower and other portions of Switzerland's lands, and this road came to be known as "The Kilmichael Tower-Wohlford Road." It is this road and access over it to the subsequently constructed Blue Ridge Parkway, which is the subject of controversy.

In 1937, at the request of the United States, the State of North Carolina by condemnation took a fee simple title to a strip of land, 200 feet in width, running through lands of the Switzerland Company. It also took certain related scenic easements. The land and the easements North Carolina thus acquired it conveyed to the United States in 1938. The deed recited that it was a transfer of the grantor's proprietary estate and was not a surrender of state sovereignty. North Carolina expressly reserved the right to maintain "existing public roads" within the area, subject to location changes that might be effected by supplementary agreement. This grant, of course, was for the purpose of construction by the United States of the Blue Ridge Parkway, which was planned ultimately to connect the Shenandoah National Park in Virginia with the Great Smoky Mountains National Park in North Carolina-Tennessee.

Thereafter, the United States proceeded with the construction of a section of the Blue Ridge Parkway within the 200-foot wide strip acquired by it from North Carolina and running through lands of the Switzerland Company and others. As laid out, the Parkway crossed the Kilmichael Tower-Wohlford Road and other roads in the community known as Little Switzerland. When the trial of Switzerland's right to just compensation was held in 1939, this section of the Parkway and certain connections with existing roads were actually under construction. These included connections with the Kilmichael Tower-Wohlford Road on either side of the Parkway.

There was physical access to the Blue Ridge Parkway to and from Kilmichael Tower-Wohlford Road in either direction until 1960. For the latter portion of the period, however, there were in existence license agreements between the Park Service and the Switzerland Company, authorizing the connection as if for a private rather than a public road. In 1960, Switzerland insisted that it was not a gratuitous licensee, that it had an absolute right of access to the Parkway over the road, and it refused to accept a renewal license agreement. The Park Service then erected physical barricades which prevented access to the Parkway from either direction from the Kilmichael Tower-Wohlford Road. This action effectively shut off access to the Tower and to certain lands, in the vicinity of the Tower, owned by the Switzerland Company and the individual plaintiff, Walker. We infer that it is important to the plaintiffs to establish a right of access to the Parkway rather than permissive access to the Parkway in order to develop their lands in that area for residential or commercial use. On the other hand, the National Park Service is intent upon the avoidance of acquisition of rights by prescription when there are no pre-existing rights of access. Thus, this controversy ensued.

The plaintiffs claim that the National Park Service had no right to obstruct the Kilmichael Tower-Wohlford Road because it was a public road at the time of condemnation, reserved by North Carolina in its deed to the United States. The District Court concluded that it was not a public road within the meaning of the deed, and this conclusion is not without support. Its preliminary finding that the road originally was laid out for "public use" is not a contradiction, and it does not require a contrary conclusion. Undoubtedly the Switzerland Company wished to make its Kilmichael Tower accessible to the public, but, during some of this period, at least, it charged admission fees to the Tower. During one winter when the tower was being damaged by vandals, the Switzerland Company, itself, closed the road to avoid further depredation. In a deed to the predecessor in title to the plaintiff, Walker, the Switzerland Company included a reser-

-vation of control of the road, and the same reservation for Switzerland's benefit was included in the subsequent deed to Walker.

Whether the public may have acquired some interest in the road, however, is not determinative of the plaintiffs' factual contention. Though it may have been laid out for use by the public and though it may have been used by the public, the question is whether or not it was a public road as that term was used in the reservation in the deed from North Carolina to the United States. That question is not answered by a finding that the public had used the road or that its constructor had intended that the public use it.

The intention of the parties to the deed from North Carolina to the United States is persuasively indicated by a supplemental agreement executed some three months after delivery of the deed. This agreement purports to provide for the location and construction of every crossing of every public road with the Blue Ridge Parkway in the area. It specifically provides for four such crossings in the Little Switzerland community, one of which was to be by a grade separation structure without interchange of traffic, while the other three were to have access roads or were to be crossings at grade. The Kilmichael Tower-Wohlford Road was not mentioned in any way in the supplemental agreement purporting to cover all public roads within the reservation clause of North Carolina's deed. North Carolina never has maintained this road, and, if it had intended to reserve the right of maintenance, the reasonable inference is that the road would have

been mentioned in the agreement which purports to be all inclusive of the roads to which the reservation was intended to apply.[1]

We have set forth the underlying facts and the substantive contentions of the parties, not for the purpose of reviewing the merits of the ultimate conclusion of the District Judge that the road in question was not a public road within the meaning of the reservation in North Carolina's deed,[2] but for the purpose of putting the controversy in its context. It is apparent that the plaintiffs are contending, as bounding owners on a public road, that they are entitled to continued access to the Parkway because the United States, in acquiring the fee simple title to the strip of land, acquired no right from North Carolina to close the public roads. On the other hand, it has been the position of the National Park Service that it has a right to close this road, a private road in its view, and, indeed, that under the authorizing statute it has no power to grant more than a terminable, permissive right to use this road within the boundaries of the land the United States owns in fee. If the plaintiffs are granted the relief they seek, of course, the employees of the National Park Service, under the direction of the individual defendants, will be required to remove the obstructions and barricades and provide continued access from the Kilmichael Tower-Wohlford Road to the Blue Ridge Parkway.

It is under these circumstances that we face the preliminary question as to whether or not this action is maintainable against the three individual defendants, or whether it was properly dis-

---

1. Plaintiffs urgently argue that the supplemental agreement should be construed as applying only to public roads which were to be relocated. We are not persuaded that narrow construction is correct. The reservation in the deed does contemplate a subsequent agreement on location changes, but the agreement actually executed deals with the public roads in the area which were not to be relocated as well as those which were. Moreover, the Kilmichael Tower-Wohlford Road, though unmentioned in the

supplemental agreement, was actually relocated. As reconstructed, one traveling from one end of that road to the other would travel for a short distance on the Parkway.

2. Our statement that the District Court's finding of ultimate fact is not unsupported, is not intended as an indication that the fact-finder in some subsequent proceeding might not find the facts differently.

missed as, in substance, a suit against the United States for injunctive relief to which the United States has not consented.

In United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171, it was held that an individual might maintain an action for the possession of land against individuals wrongfully withholding possession from him, though the individuals were employees or officials of the United States and acting for it. The Court thus rectified the wrongful seizure by the United States of the George Washington Parke Custis estate, known as Arlington, upon which Arlington National Cemetery is now located.

The general principle that the sovereign's wrongs may be rectified by ejecting its servants has not survived without substantial qualification, however.

It is difficult to find complete consistency in application of the rule of the Lee case prior to 1949. Though long after passage of the Tucker Act, however, it exhibited substantial vitality in 1947 when the Supreme Court decided Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209, as it had earlier when Colorado v. Toll, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927, and Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L. Ed. 1074, were decided. The tide set definitely in the other direction, however, with Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

In Larson, it was held that an action for equitable relief may be maintained against a governmental agent, without the necessity of joining the sovereign, only if the statute which purportedly authorized his conduct was unconstitutional in its application or the agent's act was beyond his delegated authority. And the bounds of his delegated authority, the Court held, were determinable as in the common law of agency. The delegated authority encompasses not only decisions of the agent which are right, but those which are wrong and harmful to the claimant. The Court, thus, specifically rejected the notion that when a governmental agent's conduct is tortious, as where he wrongfully interferes with the plaintiff's possessory rights to property, he may not shield himself behind the doctrine of sovereign immunity.[3] The Courts' explanation of Lee demonstrates Lee's inapplicability to this case in view of the existence of a provision for payment of compensation.

This is manifest in the subsequent decision of Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168. That was an action of ejectment against a Forest Service officer to try title to land. It was conceded that the defendant acted within his delegated authority, since the Forest Service claimed the land under a deed. On that account, despite the fact that the plaintiffs might have been able to prove theirs the superior title and an exclusive right of possession, it was held that the action could not be maintained.

The only difference between Lee and Malone is the existence now of means for the recovery of damages for the wrongful taking. That difference was held in Malone to be critical, and the availability of damages is now held to foreclose equitable remedies.

The effect of the erection of the doctrine of sovereign immunity to foreclose equitable actions is to prohibit equitable remedies without consideration of the adequacy of the legal remedy or, indeed, of the interest of the United States. The result is that every claim advanced by an overly zealous agent of the sovereign and by those multitudes of governmental agents who feel unauthorized to relinquish a governmental claim, however baseless it may appear, effects an informal seizure as if by condemnation. It is done, however, without considera-

3. Even under the rejected notion, of course, equitable relief could be granted only if the force of the decree would be expended upon the errant agent and without imposing burdens upon funds or property unquestionably belonging to the sovereign. See the dissenting opinion of Mr. Justice Frankfurter in Larson p. 712, 69 S.Ct. p. 1472.

tion of the appropriateness of condemnation or a comparison of the potential advantage to the United States with the cost of payment of just compensation.[4]

Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15, and Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191, are not so relevant here as Larson and Malone. They do illustrate the renewed and abounding vigor of the doctrine of sovereign immunity as now applied by the Supreme Court. They, the most recent pronouncements on the subject indicate no disposition to consider a retreat from Malone. And Dugan v. Rank clearly instructs us that equitable relief against governmental officers cannot be allowed when the requested relief would affect the administration of a governmental project and require congressionally unauthorized expenditures by the United States, notwithstanding that payment of just compensation, the open alternative, might be a greater burden upon the public treasury.

We take our cue, of course, from the decisions of the Supreme Court. If some of us, appraising the policy considerations, were inclined to assign a more restricted role to the doctrine of sovereign immunity in this area, we could not follow our inclination when the Supreme Court, clearly and currently, is leading us in the other direction.

Applying the doctrine as recently developed by the Supreme Court, the plaintiffs cannot prevail. There is no suggestion of constitutional invalidity of any statute under which the defendants and their subordinates have acted. Construing the plaintiffs' rights of access to a federally owned parkway over federally owned land to be permissive only, they clearly acted within the scope of their authority in declining to acquiesce in the plaintiffs' assertions of greater rights. Whether their determination of the plaintiffs' rights was correct or erroneous and their acts lawful or tortious, they did not depart from their delegated authority as Larson clearly holds.

The United States owns in fee the land where the obstructions to the road are maintained. The statute, 16 U.S.C.A. § 460a–2 authorizes these defendants to administer those lands. All of this the plaintiffs conceded. If, in 1938, the road now closed was a public one within the meaning of the reservation in North Carolina's deed, if, regardless of the status of the road, the plaintiffs have an access easement because Switzerland's right of access to the now isolated lands was not effectively condemned in 1938, the defendants and their subordinates have wrongfully exercised their delegated authority, but they have not exceeded it. The scope of the delegated authority to administer the lands of the United States is not restricted by possible or actual encumbrances upon the Government's title. If the defendants have committed a wrong in the exercise of their delegated authority, if their administration of the land has deprived others of the enjoyment of their legal rights, a departure from the delegated authority is not shown. This is the plain holding of Larson.

The plaintiffs cannot bring themselves within either of the two exceptions to the rule of immunity which are now recognizable.

That this is, in substance, an action against the United States is also illustrated by the nature of the relief sought.

4. The present case is illustrative. The Park Service has no objection to maintenance of access to the Parkway here if only the plaintiffs would agree with it that their use is permissive. The United States has no independent interest in, or advantage to be gained from, a continuing closure of these roads. If it should ultimately be determined, however, that Park Service officers were mistaken in their interpretation of the plaintiffs' rights, then their conscientious assertion of the protective, but erroneous, claim has occasioned a taking of rights of access to large tracts of land. Just compensation for that taking would probably be extremely disproportionate to the value, if any and none is apparent, to the United States of the physical closure of this road at its connections with the Parkway.

and the relation of the individual defendants to the alleged wrong.

The plaintiffs seek the return of no specific res. They seek a judgment declarative of their rights as against the United States. This is apparent in their joinder as defendants of individuals, occupying high governmental offices, who could have had no personal involvement in the little incidents giving rise to this controversy. The subordinates who erected the barricades are not the defendants, but their ultimate superiors, who obviously are made so only because of their offices.[5]

■ We conclude that this action cannot be maintained because of the sovereign immunity of the United States. In substance, it is an action against the United States. Since the United States, an essential party, has not consented to be sued, the action must be dismissed.

■ This leaves the plaintiffs to the pursuit of such remedies as they may have for the collection of just compensation for taking their access to their properties.

The defendants here contend that the taking occurred in 1937 and that compensation was paid for it as a result of the condemnation proceeding in 1939. This contention is an outgrowth of the defendants' basic contention that the road was a private one and thus not excluded from the deed of North Carolina. It is buttressed by Switzerland's insistence in the 1939 condemnation trial that it had no assurance of access. It is greatly weakened, however, by North Carolina's insistence in the condemnation trial that access would be preserved, and that position was dramatically supported by employees of the United States who testified that the physical connections between the Parkway and this road were actually under construction at the time of trial. The jury might well have thought that Switzerland was not being deprived of what government employees were busily engaged in providing for it and assuring to it. Regardless of the ultimate resolution of the question of the status of this road in 1938, therefore, there is a substantial question whether the United States may now contend that Switzerland's right of access over it was condemned in 1937 and compensation paid for it in 1939. If not, there may have been no appropriation of Switzerland's rights of access to its lands in the vicinity of the tower until the barricades were erected and the road physically closed, at which time a claim for just compensation would have arisen.

Those are questions for another day, however. They are not cognizable in this action for equitable relief only

Affirmed.

5. See the dissenting opinion of Mr. Justice Frankfurter in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 712, 69 S. Ct. 1457.