**Barney R. COLSON et al., Appellants,**

v.

**Walter J. HICKEL, Secretary of the Interior, Appellee.**

**No. 26212.**

United States Court of Appeals, Fifth Circuit.

June 16, 1970.

Rehearing Denied and Rehearing En Banc Denied Aug. 17, 1970.

James E. Rodgers, Richard Hildreth, Washington, D. C., for appellants.

Edward F. Boardman, U. S. Atty., Jacksonville, Fla., Ramsey Clark, Atty. Gen. of U. S., Herbert Pittle, Roger P. Marquis, Shiro Kashiwa and Clyde O. Martz, Asst. Attys. Gen., Dept. of Justice, Washington, D. C., for appellee.

Before COLEMAN, SIMPSON, and MORGAN, Circuit Judges.

COLEMAN, Circuit Judge.

It is hardly likely that the Treaty Makers at Prairie du Chien in the year 1830 had any idea that their work would be the starting point for litigation a hundred and forty years out in the future, but it was. This case bristles with legal questions, but the facts are undisputed. The legal complications are compounded by the presence of two separate sets of land scrip, each of a history different to the other. The opinion of the District Court is reported at 278 F.Supp. 826 (M.D., Fla., 1968). We affirm.

I

## THE FACTS

### A. Basic History

On July 15, 1830, by the Treaty of Prairie du Chien (7 Stat. 328) the United States set aside to the halfbreeds of the Sioux Indians a reservation of land in Minnesota. Twenty four years later, by the Act of July 17, 1854 (10 Stat. 304) Congress extinguished this reservation by the issuance of scrip certificates in lieu of the reserved lands.

The pertinent provisions of the 1854 Act read as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President be, and he is hereby, authorized, to exchange with the half-breeds or mixed-bloods of the Dacotah or Sioux nation of Indians, who are entitled to an interest therein, for the tract of land lying on the west side of Lake Pepin and the Mississippi River, in the Territory of Minnesota, which was set apart and granted for their use and benefit, by the ninth article of the Treaty of Prairie du Chien, on the fifteenth day of July, one thousand eight hundred and thirty; and for that purpose he is hereby authorized to cause to be issued to said persons, on the execution by them, or by the legal representatives of such as may be minors, of a full and complete relinquishment by them to the United States of all their right, title, and interest, according to such form as shall be prescribed by the Commissioner of the General Land-Office, in and to said tract of land or reservation, certificates or scrip for the same amount of land to which each individual would be entitled in case of a division of the said grant or reservation *pro rata* among the claimants— which said certificates or scrip may be located upon any of the lands within said reservation not now occupied by actual and *bona fide* settlers of half-breeds or mixed-bloods, or such other

persons as have gone into said Territory by authority of law, or upon any other unoccupied lands subject to preemption or private sale, or upon any other unsurveyed lands, not reserved by Government, upon which they have respectively made improvements: *Provided,* That said certificates or scrip shall not embrace more than six hundred and forty, nor less than forty acres each, and provided that the same shall be equally apportioned, as nearly as practicable, among those entitled to an interest in said reservation: *And provided further,* That no transfer or conveyance of any of said certificates or scrip shall be valid."

The genesis of the pending litigation is supplied by the express prohibition of the statute: *"no transfer or conveyance of any of said certificates or scrip shall be valid".*

It did not take long for someone to find a hole in the fence. This is how it worked: Anyone desiring to acquire scrip rights from an Indian to whom the scrip had been issued would obtain from the scripee the scrip certificate. He would also obtain two powers of attorney, left blank as to the description of the land and as to the name of the attorney. By one power of attorney the scripee authorized the selection of the land and the location of the scrip, coupled with the power to obtain a patent from the Government. By the second instrument the attorney in fact was authorized to sell and convey any land which the scripee might thereafter acquire. The first instrument would be filed with the General Land Office. After the location was made and a patent issued in the name of the scripee, a conveyance of the land would then be executed and delivered under the authority of the power of attorney to sell.

The General Land Office quickly challenged this procedure. It held such transactions to be invalid as in violation of the statutory prohibition. The Courts, however, did not agree with that position. The issue was unequivocally settled by the Supreme Court in Midway Company v. Eaton, 183 U.S. 602, 22 S.Ct. 261, 43 L.Ed. 347 (1902), which went up on a writ of error to the Supreme Court of Minnesota.

Citing its prior decisions in Myrick v. Thompson, 99 U.S. 291, 25 L.Ed. 324 (1878), and Felix v. Patrick, 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892), the Court approved the use of powers of attorney as above described "because the transactions did not constitute a transfer of the scrip as such * * * the transactions were intended as a conveyance of the land, and represented that intention, and could not be shown to be a transfer of the scrip." The Court specifically alluded to the language in Myrick v. Thompson, supra, to the effect that it could conceive of no reason why a scripee was not at liberty, either before or after location was made, to enter into an agreement to secure title to the located lands on the payment of an agreed consideration.

By Interior decision D–29,200, dated April 29, 1914, the decisions in Myrick v. Thompson, *supra,* and Midway Company v. Eaton, *supra,* were recognized by the Department in the following language:

"In view of the holding of the Court, it would appear that where a person has purchased land so located and patented under this class of scrip and the title has failed because the Government had already disposed of the land, such purchaser shall be permitted to govern the use of the scrip for purposes of making a new location. Of course, the new selection would have to be in the name of the scripee as was the former one."

### B. The Anthony Renville—Anna R. Kean—Barney R. Colson, Scrip

This scrip, Certificate 398 D, was originally issued to Anthony Renville, a Sioux halfbreed, for 160 acres of land. On January 10, 1874, Renville executed and delivered the customary powers of attorney to John S. Newman. March 1, 1877, in the name of Renville, Newman

obtained a patent to land located in the dried bed of a previously existing lake in Indiana. By intervening conveyances the title to the land became vested in Anna R. Kean. This patent was held void by the United States Supreme Court in Kean v. Calumet Canal and Improvement Company, 190 U.S. 452, 23 S.Ct. 651, 47 L.Ed. 1134 (1903). The Court held that in 1853 the property had been conveyed by the United States to the State of Indiana under the Swamp Land Act of 1850.

In 1913, the Circuit Court of Lake County, Indiana, in the case of Anna R. Kean v. John S. Newman et al., held that as a result of the cancellation of the patent the contract for the exchange of certificate 398–D had been left unfulfilled as expressed in the Renville power of attorney and that the contract, being specific, for valuable consideration, and for Anna Kean's benefit, remained in full force and effect. The Department of the Interior, April 29, 1914, Case D–29,200, supra, determined that Anna R. Kean should be permitted to govern the use of the scrip for the purpose of making a new selection, requiring only that the new claim be made in the name of the scripee.

On June 10, 1914, Anna R. Kean, acting for Anthony Renville, his heirs and legal representatives, executed a power of attorney, in blank as to the designee, to enter upon, and take possession of any and all pieces and parcels of land or the timber or other materials thereon in the State of ———, "which we own, or which we may hereafter acquire or become seized of" under and by virtue of Scrip Number 398, for 160 acres.

This power of attorney was executed in Cook County, Illinois.

### C. The Ellen Angie [Williams] Scrip

In Dewey County, South Dakota, on February 21, 1910, Ellen Angie appointed Jesse L. Linn her true and lawful attorney to enter upon and take possession of any and all lands which she then owned · or in which she was entitled or interested, and to take possession of any and all such lands by virtue of the location of Sioux half-breed Scrip Number 379–C, for 80 acres, issued to her under the Act of Congress of July 17, 1854, and likewise empowered the attorney in fact to select and convey such lands, further empowering the attorney in fact to appoint a substitute or substitutes, etc.

On December 26, 1914, Jesse L. Linn executed a power of attorney, in blank as to the designee.

This instrument was executed in Polk County, Oregon.

On May 19, 1915, in Dewey County, South Dakota, Ellen Angie Williams quitclaimed the land, grantee blank, description blank, which might thereafter be acquired by location of Sioux halfbreed Scrip Number 379–C.

In 1925, Colson acquired the powers of attorney and other documents from a holder which guaranteed the validity of the scrip.

### D. Subsequent Proceedings Prior to this Litigation

On January 20, 1956, the Director of the Bureau of Land Management, Department of the Interior, advised Barney R. Colson that the above mentioned scrip certificates were valid, had not theretofore been presented to acquire public land of the United States, that they might be used for that purpose by the attorney in fact or the substitute attorney in fact, and that the material presented by Colson evidenced his ownership of the scrip certificates. The scrip certificates were thereafter duly recorded in department records as scrips under the Act of August 5, 1955 (69 Stat. 534).

On August 27, 1958, Colson, invoking the scrip, filed his claim with the Eastern States Land Office, Bureau of Land Management, Department of the Interior, claiming 239.99 acres of land in Florida. He also petitioned for appropriate classification of the vacant lands under the Taylor Grazing Act, 43 U.S.C. § 315 et seq. On February 26, 1959, the Eastern States Land Office agreed that Colson might claim a portion [144.42 acres] of

the land described in his application. That portion of the application for other lands over and above 144.42 acres, was disapproved.

Colson then appealed to the Director, Bureau of Land Management, on the question of whether a certain parcel, known as land parcel K, was vacant public domain and therefore available to him under his scrip credentials.

This, from Mr. Colson's standpoint, turned out to be a very unfortunate step. The Director of the Bureau held that Colson's scrip, though valid, was insufficient to support his application to any land in any respect because the powers of attorney and quitclaim deed did not authorize Colson to locate in the name of either scripee the lands to be acquired. This was the sole ground for the decision.

Mr. Colson then appealed to the Secretary of the Interior, August 24, 1960.

## II

### THE LITIGATION

On September 16, 1963, the Secretary affirmed the decision of the Bureau of Land Management. Colson unsuccessfully requested reconsideration of the Secretary's decision. He then filed suit in the United States District Court for the Middle District of Florida against the Secretary of the Interior, invoking § 10 of the Administrative Procedure Act, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and further asserting diversity jurisdiction and that the matter in controversy arose under the laws of the United States. It was alleged that the District Court had venue over the lands under 28 U.S.C. § 1392.

The District Court agreed with the Secretary of the Interior that the documents in question did not confer upon Colson the right to select and locate lands under the scrip certificates in the name of the scripees; that it might be presumed, in the absence of any evidence to the contrary, that all of the original scripees are now dead; that even if the powers of attorney had been valid, they were revoked by the death of the scripees, unless the powers were coupled with an interest; if they were coupled with an interest the transfer would constitute a violation of the prohibition that no transfer or conveyance of the scrip would be valid; that the suit was against the United States, which was not a party, and had not waived its sovereign immunity; that Colson is barred from maintaining his action because of laches; that Colson had shown no right to relief; that the Secretary of the Interior had made no determination as to whether any of the lands applied for by Colson is available for selection; and that judgment would be entered for the Secretary.

On this appeal, Mr. Colson argues that the District Court erred in holding that this was an action against the United States; in holding that the action is barred by laches; in holding that the Colson documents did not entitle him to exercise and consummate the claim to vacant public domain and/or money in lieu of the land.

The Secretary, in his brief, narrows the issues to two:

Whether the District Court had jurisdiction, and whether the District Court was correct in holding that Colson had no right to claim public lands under the substitute powers of attorney.

## III

### THE DECISION

We are of the opinion that the prior decisions of this Court, relying upon decisions of the Supreme Court, require us to hold that this was, in fact, a suit against the United States, to which it had not given its consent.[1]

Simons v. Vinson, 5 Cir., 1968, 394 F. 2d 732, cert. denied 393 U.S. 968, 89 S.Ct. 398, 21 L.Ed.2d 379, was a suit against officials of the Department of the

---

1. We are aware of the decision, and the dissenting opinion, in State of Washing-ton v. Udall, 9 Cir., 1969, 417 F.2d 1310, 1322.

Interior and its subordinate agencies for the enforcement of title to land on the Red River. The suit asserted that by virtue of a treaty with Spain, and subsequent decisions of the Supreme Court, the land in question had become the property of plaintiffs by accretion. With one judge dissenting, it was held that the immunity of the sovereign extended to the Department of the Interior and its agencies, that the suit was, in fact, against the sovereign because it would operate against the public domain. The dismissal ordered by the District Court was affirmed.

Gardner v. Harris, 5 Cir., 1968, 391 F. 2d 885, was a case in which a private citizen brought suit against the Superintendent of the Natchez Trace Parkway to abate a nuisance caused when the Superintendent erected barricades across an easement owned by the plaintiff and which had afforded him ingress and egress from the Parkway. The district court held that the Superintendent had exceeded his statutory authority and was thus amenable as an individual to injunctive relief. This Court reversed. It was further held that the Superintendent, in the administration and maintenance of the Natchez Trace, was acting without his statutory powers. It was said, "merely because the Superintendent may have been acting wrongfully in interfering with plaintiff's access to the highway, either as a matter of violation of property rights under the deeds or as a tort under principles of general law, does not amount to circumstances fulfilling the exception that the officer must be acting beyond his statutory powers", citing Switzerland Company v. Udall, 4 Cir., 1964, 337 F.2d 56, dealing with a similar situation on the Blue Ridge Parkway. It was noted, footnote 11, 391 F.2d at 888, that the decision did not preclude a timely action in the proper forum for just compensation.

These decisions were grounded upon Malone v. Bowdoin, 1962, 369 U.S. 643, 82 S.Ct. 980, 8 L.E.2d 168; Dugan v. Rank, 1963, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 115; and Larson v. Domestic and Foreign Commerce Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

In Simons v. Vinson, *supra*, 394 F.2d at 736, it was stated

"[T]he suit is unquestionably against the United States. The corollary is clear—the United States is an indispensable party to such an action. Inasmuch as it has not consented to be sued, the Court lacks jurisdiction to maintain the suit unless appellants can show that it is within one of the exceptions to the Dugan v. Rank general rule. Appellants must show either that the statutes are void under which Congress authorized the Secretary of Interior to lease the disputed land, or that the Secretary or his agents acted beyond the scope of their statutory authority."

The matter of the issuance of the patents was clearly within the valid statutory authority of the Secretary of the Interior and his agents. The Dugan v. Rank exceptions, therefore, are of no assistance to the appellant.

The dismissal in the District Court was correct and we accordingly find it unnecessary to discuss or decide the other points raised by the parties on appeal.

The judgment of the District Court is Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.