**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1858, et al., Plaintiffs,**

v.

**Howard CALLAWAY, Secretary of the United States Army, and Major General Bates C. Burnell, Commanding Officer of the United States Army Ballistic Missile Defense Systems Command at Redstone Arsenal, Alabama, Defendants.**

Civ. A. No. 75–G–652–NE.

United States District Court,
N. D. Alabama,
Northeastern Division.

June 18, 1975.

David B. Blankenship, and C. Lynwood Smith, Jr., Hornsby, Blankenship, Higgs & Smith, Huntsville, Ala., for plaintiffs.

Wayman G. Sherrer, U. S. Atty., and Jack Rivers, Asst. U. S. Atty., Birmingham, Ala., Robert M. Nutt, Major, JAGC, Asst. Gen. Counsel and Capt. R. Craig Lawrence, Dept. of the Army, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

The plaintiffs came before this court on a motion for a preliminary injunction to prevent the United States Army from effecting a reduction in force (RIF) among the Civil Service personnel at its Ballistic Missile Defense Systems Command (BMDSCOM) at Huntsville, Alabama.

The plaintiffs contend that the defendants in violation of certain Army regulations entered three private contracts for the performance of systems engineering and technical assistance, hereinafter referred to as SETAC, and that these contracts provided jobs for private contractual personnel, positions which could have and which should have been available to the plaintiffs under "bump" and "retreat" rights established by United States Civil Service Commission regulations. The three contracts in question were to Teledyne-Brown Engineering Company, Science Applications, Inc., and M & S Computing, Inc. The plaintiffs contend that all three contracts have adversely affected them, but they contest most strongly the validity of the Teledyne-Brown contract.

Upon consideration of the complaint, motion for preliminary injunction, defendants' motion to dismiss, and supporting briefs, testimony by the parties and exhibits, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The individual named plaintiffs are Civil Service employees at BMDSCOM who will be affected by the proposed reduction in force. Plaintiff American Federation of Government Employees (AFGE), Local 1858, is the recognized bargaining agent for the Civil Service employees at BMDSCOM.

2. The defendants in this case are the Secretary of the Army and the Commanding Officer of BMDSCOM.

3. The plaintiffs allege that this is a proper class action. The allegations are sufficient and the evidence heard so far indicates that Rule 23 requirements probably will be satisfied on a hearing.

4. In December 1974 the defendants informed the BMDSCOM personnel of a reorganization of the Command. On March 10, 1975, some 296 Civil Service personnel were informed of a RIF being brought about by this reorganization. As of May 23, 1975, the proposed class included 67 persons to be separated from government service; 27 persons scheduled for retirement, including 16 involuntary retirements; and about 50 persons to be reduced from one to five grades in pay. The balance had either resigned, been reassigned, or transferred within and without the Army.

5. On August 30, 1967, the Bureau of the Budget made certain revisions in its Circular A–76. The Department of the Army implemented these revisions of the circular under Department of Defense Directive 4100.15, and it consequently revised Army Regulation 235–5 to comply with these revisions.

a. While reasserting the government's general policy of relying on the private enterprise system, the 1967 revision of Circular A–76 announced certain changes in its policies for acquiring commercial or industrial products. In the summary of changes made by the revision, there is to be noted a significant change in paragraph six of the circular, wherein it is stated: " . . . Cost

comparison studies should also be made in other cases if there is reason to believe that savings can be realized by the Government providing for its own needs. . . ."

The summary explained the revision by stating that the purpose of the change was to make it clear that where money could be saved by the government's providing for its own needs, cost studies should be made before deciding to rely upon a commercial source. The circular retained its expression of the basic policy of obtaining commercial or industrial products or services through private enterprise, and the circular limited the circumstances under which the government may provide these products or services through its own agencies. The criteria established to justify performance of these services by the government raised several points which will be mentioned later. The most important such criterion was the one justifying government commercial activity where procurement from a commercial source would result in a higher cost to the government.

b. The plaintiffs contend that Circular A–76 directed government agencies to consider costs in their evaluation of commercial and industrial type activities. However, as promulgated by AR235–5, this directive was somewhat disguised. The court's reading of this regulation indicates that it is a general limitation upon operation by the Army "in house" of commercial or industrial type activities. It establishes certain criteria necessary for a decision to perform such functions "in house." Nonetheless, the plaintiffs contend that the regulation requires three things of the Army in its commercial and industrial function determinations.

(i) The first requirement urged by the plaintiffs is said to arise under AR235–5, subsection 1–2(d), which provides:

1–2(d). This regulation will not be used as authority to enter into contracts if such authority does not oth-

erwise exist, nor will it be used to justify departure from any law or regulation, including regulations of the Civil Service Commission, or other appropriate authority. Further, it will not be used as a basis for contract personnel procurement not authorized by law, nor as a means of avoiding Government personnel or salary limitations.

■ As to this subsection, the plaintiffs first contend that the defendants have used AR235–5 to justify departure from the Armed Services Procurement Regulation (ASPR) disallowing independent contracts for personal services. This contention will be discussed more fully later in these findings. The plaintiffs contend also that the defendants have used AR235–5 to justify departure from the AR235–5 sections prohibiting contracting out of managerial functions; the court, however, finds that AR235–5 specifically allows contracts for support managerial functions, which the defendants contend this contract involves, and therefore the court defers a determination of this issue until a final hearing on the merits.

Next, as to this subsection the plaintiffs contend that the defendants have used AR235–5 to justify departures from the Civil Service Commission's regulations on "bump" and "retreat" rights as formulated in Federal Personnel Manual (FPM), chapter 351.

Last, as to this section the plaintiffs contend that the defendants have used AR235–5 as a basis for avoiding government personnel limitations placed upon BMDSCOM and the salary limitations of 5 U.S.C. § 5308. The plaintiffs introduced expert testimony from Mr. Glen Sadler to the effect that while a member of the board reviewing the SETAC function, he had personal knowledge that the Army's reason for making the contracts was to avoid the BMDSCOM personnel limitations. This evidence is buttressed by a comment contained in the September 25, 1973, comparative cost analysis performed in accordance with AR235–5,

wherein it is noted that the office of the Secretary of Defense in a January 1971 memorandum stressed that the use of the project office of Site Defense should be held to a minimum and a SETAC-type organization utilized in its place as much as possible. This offers a clear indication of an effort to skirt the personnel limitations of an agency. Testimony from the defendants' witness, Mr. Charles Finley, indicates that a compelling reason for the SETAC function was the inability to obtain the personnel required under Civil Service salary limitations and in essence that the contract was a means of avoiding these limitations.

(ii) The second requirement urged by the plaintiffs is said to arise under AR235-5, subsection 1-4(b). The plaintiffs contend that under subsection 1-4(b)(2), the Army had the responsibility to procure products and services from the source least costly to the government; and under 1-4(b)(3) to operate commercial and industrial activities in the most economical manner possible; and under 1-4(b)(4) to make maximum use of interservice/department/agency support. In this regard the plaintiffs contend, and they have demonstrated, that cost analyses performed prior to issuance of the Teledyne-Brown contract, and at subsequent stages preceding renewal of that contract, indicate that the SETAC function could be performed at less cost to the government "in house" than under the contract. This difference in cost varied from 21.63 per cent in July 1973 to 28.85 per cent in September 1973. The plaintiffs argue that the cost analyses performed in February 1974 and August 1974 showing a greater cost for "in house" performance were incorrect and arbitrary for various reasons discussed herein. The plaintiffs contend that the evidence shows, and the defendants concede, that approximately 75 per cent of the SETAC effort was capable of being performed by interservice support (i. e., BMDSCOM), and that maximum use was not made of said in-terservice support. There is no evidence to indicate what effort was made either prior to, or at subsequent reviews of, the SETAC contract to determine the capabilities of "in house" or interservice activity as required by AR235-5, subsection 3-3(c)(4)(a).

(iii) The third requirement urged by the plaintiffs is said to arise under AR235-5, subsection 1-4(b)(5) and section 3-3. The plaintiffs contend that under these provisions it was necessary for the Army to operate a systematic and continuing review of all contract support being procured and review the contract with the objective of reevaluating the data and rationale upon which selection of the current method of performance was based. The court finds that under the above cited sections of AR235-5, the Department of the Army had the responsibility to periodically and systematically review the decisions and to determine whether functional changes had occurred or would occur which would necessitate conversion to other alternatives and under subsection 3-3(c)(2) to evaluate the functions and performance decisions on the basis of cost if "in house" performance could not be justified under the compelling exceptions criteria established in subsections 2-3(a)-(d).

Evidence has been presented that after SALT-I agreements went into effect changes in the goals and functions of the SETAC effort and the military policy upon which it was based occurred that would have made "in house" operation of these functions more appropriate.

6. The plaintiffs contend, and the court finds, that ASPR 22.102.1(a) prohibits contracting by the Department of Defense for personal services. This regulation sets out criteria governing an Army contracting officer when reviewing a contract to determine if it is a personal service contract. Among other things, it requires a determination of whether the services can be properly defined as an "end product." The court

has considered documents entitled "Determination of Nonpersonal Services" in relation to the SETAC contract completed by J. D. Gregory, contracting officer, on August 10, 1972, August 22, 1973, and August 16, 1974. On those determinations of August 10, 1972, and August 22, 1973, the contracting officer indicates that the services are an end product and supports the determinations by supplemental memoranda as required by 22.102.4. However, on the determination dated August 16, 1974, the contracting officer determined that said services are not an end product. This determination is not supported by a memorandum as required by the regulation. This obvious inconsistency raises some question as to the nature of the services to be performed by this contract. The plaintiffs offer testimony by a Mr. Davis, a former contracting officer with the National Aeronautics and Space Administration, with expertise acquired through much work with interpretations of this ASPR. He testified that after review of the scope of work detailing the nature of the performance under this contract, the information presented to him would not have been sufficient to make a determination that the contract was for an end product, but that in his opinion, based upon all the criteria enunciated in the ASPR, this contract was one for personal services. The defendants offered no rebuttal to this testimony. Therefore, this court finds that there is a showing by the plaintiffs that this regulation was not complied with. The court has before it further evidence to indicate that the Department of the Army has itself treated this function as one for personal services; on the August 1974 cost analysis it was recommended that 13.5 man years be brought "in house" for performance. This indicates this portion of the work would call for the services of 13.5 personnel to perform personal services and not to accomplish completion of any end product.

7. From the above stated facts this court finds that the plaintiffs have made a prima facie showing that the defendants acted arbitrarily and capriciously in their application of these regulations to the SETAC contract.

8. The court finds that upon the authority of the previously described Bureau of the Budget circular and AR235–5, paragraph 4–2(3), the Army was required to complete cost analyses reviewing the SETAC contract in accordance with the general principles outlined in the regulation. The court further finds that under paragraph 4–2(3) the Army element preparing the cost analysis is responsible for maintaining complete objectivity in estimating costs and must use the best evidence available to substantiate the estimates. Actual cost data should be used when available. The court has before it four cost analyses performed in review of the SETAC function and dated July 23, 1973, September 25, 1973, February 21, 1974, and August 1, 1974. As previously alluded to, these cost estimates present a factual conflict as to the relative costs of performing this function by an "in house" government agency. The court remains puzzled as to how a cost analysis concluding that it would be approximately 30 per cent cheaper in September 1973 could be so completely contradicted by two subsequent cost analyses performed some five and eleven months later showing a greater cost to perform the function "in house." The defendants offered no evidence to reconcile this conflict. The court is not aware of any economic conditions which occurred during this period which could have raised the cost of government performance as compared with performance by a private contractor to the drastic extent indicated by the two most recent cost analyses. The court finds, however, that on the two latter comparative cost analyses, in the computation of the relative cost of contract performance versus government performance, an item entered on line 26 in the amount of approximately $2,300,000.00 was added to the potential cost of the government's per-

formance. The contract originally required a total effort of 169 man years. This technical jargon means that 169 employees would be necessary for each year of the contract. Funding restraints imposed by Congress resulted in reduction of the SETAC effort to a level of 129 man years (or 129 employees). The Army's own cost analysis revealed that 100 man years of the function could be performed by government "in house" personnel. The remaining 29 man years, it is agreed by the parties, would necessarily either have to be brought "in house" from the private sector or contracted out. Plaintiffs offered testimony by Mr. Glen Sadler that in his professional opinion, based upon his knowledge of the SETAC function, clearly 70 per cent of the SETAC work could be performed by personnel affected by the challenged RIF and that with some retraining large portions of the remaining 30 per cent could be performed by present personnel. However, the court finds at this stage that the evidence clearly indicates 100 man years could be performed "in house." The question then presents itself as to how the remaining portion can be accomplished. The August 1974 cost analysis bases its conclusion that the support contract should be continued on three determinations that the court has reason to question:

(1) The cost analysis determines that a portion of the effort cannot be done by present personnel and cannot be brought "in house" because the effort requires a "floating personnel" applying highly specialized technical and scientific skills for relatively short periods of time. It further indicates that government staffing procedures prevent the necessary flexibility to perform this work and it would therefore be an impossible task for a government work force. The plaintiffs show in opposition that it appears that this 29 man-year effort has actually been operating continuously since the contract work began, and the technical and scientific skills have not been used only for short periods of time; rather, for four years the personnel have been working in the SETAC function. It does not appear to this court that the work performed by this 29 man-year effort has required "floating personnel." The court therefore finds that the plaintiffs have made a prima facie showing in rebuttal to this cost analysis conclusion.

■ (2) The cost analysis indicated that the total cost of this contract would be greater if performed by government personnel; the court questions this determination. As previously stated, line item 26 purports to be an estimation of the cost to the government of the remaining 29 years of man effort that would have to be contracted out. The court finds that the computation of this figure arbitrarily violated AR235–5, paragraph 4–2(3), and was so clearly erroneous as to shock judicial conscience. The court wonders why the consciences of those officials approving the cost analysis on September 9, 1974, were not similarly shocked. The court bases its findings upon the following facts: The line 26 "other contractor cost" was calculated on the basis of solicitation responses offered by comparative technological contractors on two totally unrelated contracts. It asserts a cost of $76,869.00 and $76,156.00 respectively as the total cost per man year of direct labor and overhead to perform this highly technical SETAC function. In direct contravention of its own regulations, it did not base the actual cost upon the previous contract experience for the services. Instead, it arrived at a figure of over $2,300,000.00, although the contractor was obviously performing at a much lower cost. This evidence is directly presented in the form of "back-up contractor personnel cost to perform SETAC operation" based on the previous contract expenditures of Teledyne-Brown Engineering Company in its performance of this contract. Nowhere in this schedule does the court observe any personnel receiving a salary equalling even one-half of the proposed necessary

cost to contract this effort out. Assuming for the sake of argument that, as line 26 indicates, overhead equals 100 per cent of direct labor, would the cost of performing this function equal the figure given by line 26? Based upon actual contract experience, the contractor had a direct labor cost for its 29 highest-paid personnel of $661,511.00. If, for the sake of argument, overhead would be 100 per cent of direct labor cost, actual contract experience indicates the total cost of these services to be $1,323,022.00, or approximately $1,000,-000.00 less than the amount represented by line 26. The court conclusively finds that the computation and representation of line 26 and the determination based upon that entry were patently erroneous. Consequently, the conclusion that it would cost more to have the contract services performed by government personnel was clearly erroneous. The court draws but one inference from this evidence—that the conclusion in the cost analysis can only be explained by bad faith and is indicative of a predetermined conclusion to recommend continuance of the contract and to make computations justify the recommendation. The court finds that on this point plaintiffs have clearly shown arbitrariness, capriciousness, and a clear violation of the Army's own regulations.

(3) The cost analysis, which was substantiated by testimony from defendants' witness, Mr. Charles Finley, the contracting officer in charge of said contract, indicates the services that could not be brought "in house" are unavailable to the government for two reasons: First, that Civil Service salary limitations would make it impossible to hire the personnel for the statutory limit of $36,000.00 a year; and second, that the personnel necessary to perform these tasks would not be readily available for government employment. Neither contention has validity. First, as has been previously stated, the actual contract experience clearly shows that not one of the highest-paid personnel presently performing these functions at Teledyne-Brown Engineering Company is receiving a salary equal to the statutory limit. Second, the very same persons presently performing the supposedly "unavailable" tasks are present in the Huntsville area in the employ of the contractor. The court does not understand how it can be said that the expertise necessary to perform these functions is not readily available when it is in fact lying at the very doorstep of the contracting officer who makes these contentions. The court finds that as to this comparative cost analysis, the plaintiffs have shown arbitrary, capricious, and clearly wrong conduct on the part of the defendants.

9. The court finds that the decision of the Army to perform the SETAC function by private contractor removes from the Safeguard Site Defense Project 129 jobs which the plaintiffs have shown to a large extent could be performed by personnel employed by Safeguard who are now facing termination, forced retirement, or reduction in grade because of the RIF under discussion here.

10. Plaintiffs have introduced evidence through testimony and exhibits that the SETAC contract was reviewed in February 1974 and that plans to implement the reorganization of BMDSCOM were under consideration and planning in January 1974, and that the contract was reviewed on a subsequent occasion after reorganization was decided upon. Plaintiffs contend, and the court finds, that they have made a prima facie showing that the defendants could have taken into consideration the contract and the possibility of bringing the project "in house" in order to reduce the impact of the RIF necessitated by the reorganization. The court withholds determination of whether the defendants should have in fact made the determination to bring the SETAC function "in house" until a final hearing on the merits. The practical effect of the continuation of the SETAC contract and of the failure to consider more fully than the evidence discloses was done the pos-

sibility of bringing the function "in house" has deprived the plaintiffs of their regulatory (FPM, chapter 351) rights to "bump" and "retreat" to government positions which they contend should have been available. The court finds that the plaintiffs have made a prima facie showing of deprivation of a recognized right because of the existence of the SETAC contract. The court further notes that had the plaintiffs had "bump" and "retreat" rights certain personnel who would have been performing the SETAC functions would have been affected by the reorganization in any event. However, it seems logical to assume that any persons displaced by "bump" and "retreat" actions by members of the plaintiffs' alleged class would be younger, more easily reemployable, and less likely to suffer the injuries complained of by the plaintiffs.

■ 11. The court finds that the deprivation of "bump" and "retreat" rights would adversely affect the plaintiffs in the following ways: They have on-going financial commitments which cannot be met if their wages are terminated; they would lose "save pay" benefits, low-cost group medical, hospitalization, and life insurance, and would experience many difficulties of an intangible nature.

12. Defendants contend that to prevent completion of the reorganization of BMDSCOM would cost the government the sum of approximately $10,000.00 per day. This argument lacks merit for two reasons: First, plaintiffs' prayer does not seek to restrain continuation and completion of the reorganization, but merely the separation, forced retirement, and reduction in grade as would be effected by the RIF which was proceeding until restrained by this court's temporary restraining order of May 23, 1975. By entering a preliminary injunction the court does not prevent implementation of the reorganization, but merely the adverse effect upon the members of the plaintiffs' alleged class that would consequently occur. Second, as stipulated by

counsel for the defendants, Congress has previously appropriated funds for the operation of BMDSCOM for the fiscal year 1974–75. The court finds that the funds remain available to pay the salaries of the members of the plaintiffs' class.

■ 13. The defendants contend that to enjoin them from completing the reduction in force would seriously jeopardize our national security. They offer no evidence to support this contention. The court cannot therefore accept this contention alone and consider it as a fact. The plaintiffs on the other hand have, to rebut this contention, produced persuasive expert testimony. The court is faced, defendants would argue, with the task of balancing the interest of national security and personal security, yet they offer no evidence to rebut that offered by the plaintiffs.

14. The court finds that the plaintiffs have presented a prima facie showing of arbitrary, capricious, or clearly wrongful actions by the named defendants in their interpretations and applications of various Army regulations. The court grants preliminary injunctive relief by ordering that the defendants be enjoined from terminating, downgrading in pay, requiring the retirement of, or reassigning, any of the plaintiffs or potential members of their class involved in the proposed reorganization of BMDSCOM, which was to take place on or about May 23, 1975. The court, however, does not enjoin the defendants from any acts of reorganization not inconsistent with this court's order; nor will the court enjoin the defendants from continued compliance with the SETAC agreement.

## CONCLUSIONS OF LAW

1. This suit is brought under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, to obtain a declaration of rights and legal relations, including a declaratory judgment, and order for temporary, preliminary, and fi-

nal injunctive relief, and such other relief as may be necessary and proper.

The complaint asserts jurisdiction of this controversy by virtue of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and 28 U.S.C. §§ 1391 and 1331(a).

Defendants challenge this court's jurisdiction over the subject matter of this complaint on two grounds: that this case presents no justiciable question and that the plaintiffs have no standing to sue.

2. JUSTICIABILITY—Defendants contend that the Administrative Procedure Act does not provide a basis for review of actions by the military, such as those under adjudication. The Administrative Procedure Act provides for the review of an agency's actions except where [(a)(1)] statutes preclude judicial review or [(a)(2)] the agency action is committed to agency discretion by law. This act "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, 686 (1967).

The legislative history of this act manifests Congress' intent to cover a broad spectrum of administrative actions. HR Report No. 1980, 79th Congress, 2nd Session, 41 (1946); *Abbott, supra* 387 U.S. 136, 87 S.Ct. 1507, 18 L. Ed.2d 681, page 687. Only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review. *Rusk v. Cort*, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). The Fifth Circuit Court of Appeals last year reviewed a case challenging actions of the Secretary of Labor and alleging violations of the Department of Labor regulations. In commenting on the government's contention that said actions were "committed to agency discretion," the court excepted by finding that the directive in question was quite specific, and found that there was no evidence that the discretion involved was based on unique competence which justifies a court in refusing review. *Reddy, Inc. v. United States Department of Labor*, 492 F.2d 538 (5th Cir. 1974). As pointed out in the findings of fact, this court finds plaintiffs have made a showing that the instructions to the agency officials preparing the comparative cost analysis were quite specific and did not involve exercise of unfettered discretion.

The review provided by the Administrative Procedure Act, unless specifically excepted, was to apply to the definition of "agency" set out in subsection 701(b)(1)(A–H). This definition includes all governmental agencies with certain exceptions. The only military agencies excepted are "(F) courts martial and military commissions;" and "(G) military authority exercised in the field in time of war or in occupied territory." Considering the general policy of the act, as discussed above, the specific exclusion of only these military areas leads this court to conclude that the Administrative Procedure Act establishes jurisdiction to review the action of the Army under these facts.

3. Defendants cite a pronouncement in the case of *Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842, 849 (1953), to the effect that "judges are not given the task of running the Army." The plaintiff in *Orloff* sought discharge from the Army for failure to issue to him a commission. The plaintiff sought to substitute the judgment of the court for that of the military in its commissioning determinations. Unlike the case *sub judice* no arbitrary, capricious, or clearly wrongful interpretations of Army regulations were asserted. The case before us is clearly distinguishable. The Court in *Orloff* stated that:

Orderly government requires that the judiciary be as scrupulous not to interfere with *legitimate* Army matters as the Army must be scrupulous not

to intervene in judicial matters. *Id.* 345 U.S. at 94, 73 S.Ct. at 540. [Emphasis added.]

The issue under consideration here is whether the actions of the defendants were "legitimate." Nothing in the *Orloff* decision poses a complete obstacle to judicial review in all circumstances.

For the same proposition, that the courts cannot review military matters, the defendants cite *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). After refusing plaintiff's prayer for continuing judicial surveillance over the training, weaponry, and standing orders of the National Guard, the Court made the following statement:

In concluding that no justiciable controversy is presented, it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief. We hold only that no such questions are presented in this case.

In footnote 16, the court cited language from its opinion in *Laird v. Tatum*, 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2327, 33 L.Ed.2d 154 (1972), wherein it said:

[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

This clear exception to the rule disfavoring intervention by the courts in military affairs was again reiterated by the Supreme Court in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d

90 (1974). Justice Hughes' statement from *Sterling v. Constantin*, 287 U.S. 378, 401, 53 S.Ct. 190, 196, 77 L.Ed. 375, is clearly the law:

What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions.

 4. As the Fifth Circuit noted as late as August of last year, it is "now well-settled that federal courts may review claims that a branch of the military failed to comply with its own regulations." *Hodges v. Callaway*, 499 F.2d 417, 419, note 2 (5th Cir. 1974). A case relied upon by defendants, *Silverthorne v. Laird*, 460 F.2d 1175, 1186 (5th Cir. 1972), speaks to this same point:

. . . once the Army promulgates regulations, it is bound to follow them. . . . [I]t has been repeatedly recognized that the Army cannot apply its rules in an arbitrary manner and that when it does so the courts have power to review.

See also, *Pitcher v. Laird*, 421 F.2d 1272, 1278 (5th Cir. 1970):

Our reluctance to review discretionary military orders, however, does not imply that any action by the Army is beyond the reach of this Court. . . . Once regulations have been provided, . . . the Army cannot apply them in an arbitrary or capricious manner.

5. Defendants in their supplemental brief point out that the Fifth Circuit Court of Appeals in the case of *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), established four criteria to be weighed when assessing the reviewability of military matters. This court, however, cannot conclude, as defendants contend, that these factors mitigate against review in the case *sub judice*. The four criteria set out in *Mindes* are as follows:

1. The nature and strength of the plaintiff's challenge to the military determination. Constitutional claims, normally more important than those having only a statutory or regulatory

base, are themselves unequal in the whole scale of values . . . .. An obviously tenuous claim of any sort must be weighted in favor of declining review.

2. The potential injury to the plaintiff if review is refused.

3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.

4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.

■■■ 6. With regard to the first factor, this court concludes that the plaintiffs have raised strong constitutional claims challenging the military's determination. The nature of their constitutional claims will be reviewed later in these conclusions. The court also concludes that there has been sufficient evidence of regulatory violations by the defendants to require judicial interference with the performance of the duties based upon interpretations which violate regulations. *Hammond v. Hull*, 76 U.S. App.D.C. 301, 131 F.2d 23 (1942), cert. denied 318 U.S. 777, 63 S.Ct. 830, 87 L. Ed. 1145 (1943).

■■■ As to the second criterion, as will be pointed out in the court's conclusions concerning the question of the plaintiffs' standing, the court concludes that the plaintiffs do not have an adequate administrative remedy, and the denial of review would effectively deny procedural due process of law guaranteed to the plaintiffs by the fifth amendment to the United States Constitution. A substantial potential injury has been demonstrated.

■■■ Since the court, by granting the motion for preliminary injunction, is not requiring termination of the contracts in question, nor termination of the reorganization of BMDSCOM, the court concludes that there will be no interference that would seriously impede the performance of vital duties.

Having found that AR235–5 places a limitation upon the discretion of contracting officers (civil servants) and the Army officials approving their cost analysis determinations, the court determines: (1) that in compiling the information upon which the allegedly erroneous decisions were made, the evidence indicates that military expertise was not applied, but rather the judgments of an Army senior civil servant; and (2) that true discretion was not exercised in the determinations in question.

7. STANDING—Plaintiffs cite a strikingly analogous case from the District of Columbia Circuit Court of Appeals. In *Lodge 1858, American Federation of Government Employees v. Paine*, 141 U.S.App.D.C. 152, 436 F.2d 882 (1970), it was held that Civil Service employees of the National Aeronautics and Space Administration (NASA), acting through their union, had standing to contest the action of the NASA administrator in procuring, through service support contracts with private contractors, manpower outside the Civil Service to perform tasks that could (and should) be performed by NASA personnel at the Marshall Space Flight Center in Huntsville, Alabama.

■■■ The same circuit court of appeals rendered an elucidating discussion of the amorphous concept of standing in the case of *Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859, 861–873 (1970). This case contains a discussion of the development of the law of standing, including the well-recognized "legal right" theory, the problems presented by section 10 of the Administrative Procedure Act, a recognition that the Supreme Court has not yet interpreted the effect of the Admin-

istrative Procedure Act upon standing, and the line of *Abbott Laboratories, supra,* cases. The court reached the conclusion that where there is a prima facie showing of arbitrariness on the part of government officials in regulatory action taken by them, sufficient to threaten substantial injury to the party affected, the injured party has standing to contest such action. This court concurs with this conclusion and holds that the plaintiffs have standing to bring this suit.

 8. Defendants argue that the plaintiffs' failure to exhaust their administrative remedies before bringing suit was an effective bar to their standing to bring this action. Admittedly, Civil Service Commission (CSC) regulations provide administrative procedures whereby Civil Service employees affected by RIF's can challenge personnel actions adverse to them. 5 C.F.R. §§ 351.-901, 351.902(b), 772.301, *et seq.* The Back Pay Act, 5 U.S.C. § 5596, provides vindication of abuses of Civil Service Rights. However, it is pointed out in the case of *Shargel v. Hollis,* 120 F. Supp. 814 (S.D.N.Y.1954), that an employee is not barred from bringing suit for injunctive relief against being separated from Civil Service on grounds of failure to exhaust administrative remedies when the administrative remedy had never before been allowed as to the questions raised by his complaint. In this regard, since at least 1970, the Civil Service Commission has specifically disclaimed jurisdiction over the issues raised by plaintiffs in the case *sub judice.* As noted by the District of Columbia Circuit Court in its 1970 opinion in *Paine, supra* 436 F.2d at 897, the Civil Service Commission has disclaimed jurisdiction to correct alleged improprieties in an agency's contracting policies which result in reduction-in-force actions. The Civil Service Commission has not altered its position in the intervening years, as demonstrated by the February 20, 1975, opinions of the Commission in the appeals of (i) Josephine S. Alviso, et al., and (ii) Clifton G. Walker, both of which were introduced by plaintiffs' counsel without objection.

 9. Defendants allege that two administrative remedies remain available to these plaintiffs. AR20–1 purportedly provides the right of review by the inspector general of the Army of complaints by military and civilian personnel. However, the Fifth Circuit recently held that:

> . . . only those remedies which provide a real opportunity for adequate relief need be exhausted. Stated somewhat differently, exhaustion is inapposite and unnecessary when resort to the administrative reviewing body would be futile. For example, a plaintiff obviously need not appeal to the particular [administrative reviewing body] if the relief requested is not within the authority or power of those bodies to grant. *Hodges v. Callaway,* 499 F.2d 417, 420–21 (5th Cir. 1974).

A review of all provisions contained in AR20–1 reveals that the inspector general is given no authority to remedy the abuses which the plaintiffs allege. To the contrary, sections 3–7 and 3–8 make clear that the inspector general's authority is essentially advisory. As aptly stated by the District of Columbia Circuit in *Paine, supra* 436 F.2d at 896:

> [T]he exhaustion requirement contemplates an efficacious administrative remedy, and does not obtain when it is plain that any effort to meet it would come to no more than an exercise in futility. [Note the citations in footnote 97.]

 The second administrative remedy said to be available to the plaintiffs was presented in affidavit form after the close of the evidence. Under intra-executive department procedures the Civil Service Commission conducts investigations of alleged proscribed contracting-out activities. Defendants contend that they alluded to the existence of this administrative procedure in

court, but were not familiar at that time with the details of it nor the regulation sections setting out this procedure. The affidavit itself does not contain information as to where this procedure is published (nor its presence in the Federal Register as required by the Administrative Procedure Act). The court concludes that plaintiffs have not had access to nor notification of the existence of this procedure until service upon them of this affidavit some days after the close of the hearing. The court does not deem this procedure to have been one so readily available to the plaintiffs as to require exhaustion of it in order to establish standing. Furthermore, after careful consideration of the representations concerning this procedure made by the affidavit, the court concludes that the agency to which the complaint must be addressed has power only to advise and has no power to compel redress of the plaintiffs' grievances.

■■■■ 10. SOVEREIGN IMMUNITY—Defendants argue that they are immune from suit because of the doctrine of sovereign immunity. They contend that the last pronouncement from the Fifth Circuit upon the issue of sovereign immunity as a bar to such actions was *Colson v. Hickel*, 428 F.2d 1046 (5th Cir. 1970). The *Colson* case held on its facts that the doctrine of

sovereign immunity was a bar to actions brought under the Administrative Procedure Act. The particular facts of that case demonstrate both its distinctions from the case *sub judice* and a general axiom of the sovereign immunity doctrine. In that case plaintiffs sought monetary damages for lands wrongfully obtained by the government. It is a well-recognized principle that the doctrine of sovereign immunity bars suits against government agencies or officials for monetary damages, but does not bar suits for injunctive or declaratory relief.[1] *See Dailey v. Lawton*, 425 F.2d 1037 (10th Cir. 1970); *Melton v. Atlanta*, 324 F.Supp. 315 (D.C.Ga.1971); *O'Brien v. Galloway*, 362 F.Supp. 901 (D.C.Del.1973).

■■■■ 11. The factual distinctions between the *Colson* case and the case *sub judice* explain a conflict in decisions in the Fifth Circuit. In *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961), the Court of Appeals held that the Administrative Procedure Act makes a clear waiver of the doctrine of sovereign immunity in actions to which it applies. On three occasions since *Colson* the Fifth Circuit has allowed jurisdiction against governmental bodies or agencies under the Administrative Procedure Act where a defense of sovereign immunity would have been otherwise available.

1. "Where, in an action against federal officers, the right asserted and relief asked are against the defendants as individuals, they cannot protect themselves from liability by their official character as representatives of the sovereign. Officers of the Federal Government may be subjected to suit for acts done under authority not validly conferred, or for acts in excess of their authority or *otherwise illegal.*" 77 Am.Jur.2d, United States, Section 115, pages 112, 113 (1975). [Emphasis added.]

As noted by the Supreme Court, when an agency prescribes rules and regulations for the orderly accomplishment of its statutory duties, its officials must rigorously comply with these requirements. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). The regulations are regarded as having the force

of law, and therefore become a part of the statutes authorizing them. 77 Am.Jur.2d, United States, Section 52, page 53 (1975).

Even though in a suit against a public officer it is claimed he acted beyond or contrary to his statutory authority, the suit may fail, as one necessarily against the sovereign, if relief requested cannot be granted by merely ordering cessation of the conduct complained of, but requires affirmative action by the sovereign, such as payment from the Treasury of monetary claims.

Plaintiffs here request no such affirmative action by the sovereign. Instead, they seek cessation by the defendant officers of the disregard of their own contracting regulations which has brought about the complained of RIF.

Therefore, the prayer for injunctive relief is not barred as one against the sovereign.

*United States v. Joseph G. Moretti, Inc.,* 478 F.2d 418 (5th Cir. 1973); *Bankers Life and Casualty Company v. Village of North Palm Beach,* 469 F.2d 994 (5th Cir. 1972); *Zabel v. Tabb,* 430 F.2d 199 (5th Cir. 1970). This conflict was aptly explained last year by the Fifth Circuit in the case of *Warner v. Cox,* 487 F.2d 1301 (5th Cir. 1974):

> Although some circuit courts, *including this one,* have seen in the APA a broad and general waiver of sovereign immunity in cases to which it applies, none has yet extended this to suits seeking money damages against the United States. . . . It has been suggested that our decision in *Colson v. Hickel,* . . . marks a retreat from the view of the APA taken in *Estrada.* . . . This we need not determine here. Assuming for Litton's benefit that *Estrada* survives intact, the case provides the company no comfort. Whatever waiver the APA provides does not extend so far as an action ex contractu for money. Having decided that this is a contract suit against the United States solely designed to force the sovereign to pay vast sums at a time in advance of its undertaking, we hold that sovereign immunity has not been waived by the APA in such a manner as to permit it to be brought in the district court.

Therefore, *Warner v. Cox* recognizes that *Colson v. Hickel* does not necessarily reverse the holding of *Estrada,* but makes clear that the bar of sovereign immunity still exists when claims for monetary damages are asserted, but has been waived by the APA in suits, to which it applies,[2] where the plaintiff seeks injunctive relief alone. Numerous district courts have held that the Administrative Procedure Act constitutes a waiver of sovereign immunity in cases to which it applies. A few of such cases are the following: *Mt. Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 376 F.Supp. 1099 (S.D.Fla.1974); *People ex rel. Bakalis v. Weinberger,* 368 F.Supp. 721 (N.D.Ill.1973); *Law v. United States Department of Agriculture,* 366 F.Supp. 1233 (N.D.Ga.1973); *International Engineering Company v. Richardson,* 361 F.Supp. 818 (D.D.C.1973); *Jaeger v. Stephens,* 346 F.Supp. 1217 (D.Colo.1971); *Nuclear Data, Inc. v. Atomic Energy Commission,* 344 F.Supp. 719 (N.D.Ill.1972); *English v. Town of Huntington,* 335 F.Supp. 1369 (E.D.N.Y.1970); *School Board of Okaloosa County v. Richardson,* 332 F.Supp. 1263 (N.D.Fla.1971); *General Motors Corporation v. Volpe,* 321 F.Supp. 1112 (D.Del.1970); *Powelton Civil Home Owners Association v. Department of Housing and Urban Development,* 284 F. Supp. 809 (E.D.Pa.1968).

12. A recent decision from the Northern District of Illinois, *Local 2816, Office of Economic Opportunity Employees Union, AFGE, AFL–CIO v. Phillips,* 360 F.Supp. 1092 (N.D.Ill. 1973), in which the plaintiff sought to enjoin an action of an agency, aptly expresses still further support for the proposition that the APA waives the doctrine of sovereign immunity. The court said, at page 1096:

> I find that the doctrine of sovereign immunity does not apply here. There is substantial authority that when a Complaint alleges, as in this case, that a government officer is acting outside his statutory powers or contrary to provisions of the Constitution the doctrine of sovereign immunity is inapplicable. . . . Even greater authority supports the proposition that

2. The Administrative Procedure Act provides merely for a review of agency action adversely affecting the complainant. Section 702. The reviewing court does not consider the merit of any claim except as is necessary to agree or disagree with the agency action. It therefore does not create a right to monetary relief where none previously existed. The reviewing court's determination does not primarily adjudicate the merits of monetary claims, only the propriety of an agency's determination thereof. The nature of the action under the Administrative Procedure Act is not, therefore, one for monetary relief. Rather it is more closely akin to declaratory relief.

when Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, applies, as it does here, the doctrine of sovereign immunity does not bar an action. As was stated in *State Highway Commission, supra,* and more specifically in its footnote 7: "Although the Supreme Court has not spoken directly to the issue, its recent cases tend to look favorably upon construing Section 10 as an affirmative grant of jurisdiction. *See* e. g., *Rusk v. Cort,* 369 U.S. 367, 371–372, 82 S.Ct. 787, 7 L.Ed. 809 (1962); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Gardner v. Toilet Goods Ass'n,* 387 U. S. 167, 177, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) . . .; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)." A number of lower court decisions support this proposition including from this circuit, *United States v. O'Donovan,* D.C., 82 F.Supp. 435, affd. 7th Cir., 178 F.2d 876, 880 (1948).

 Other circuits have implicitly adopted the above stated rationale in holding that sovereign immunity is not a bar. *Citizens Committee for the Hudson Valley v. Volpe,* 425 F.2d 97 (2nd Cir. 1970); *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972); *Eastern Kentucky Welfare Rights Organization v. Simon,* U.S.App. D.C., 506 F.2d 1278 (1974). The ancient doctrine of sovereign immunity is inapplicable to the case *sub judice.*

## PLAINTIFFS' ENTITLEMENT TO A PRELIMINARY INJUNCTION

 13. The circumstances in which a preliminary injunction may be granted are not prescribed by the Federal Rules of Civil Procedure. As a result, the grant or denial of a preliminary injunction rests in the sound discretion of the trial court. 11 Wright and Miller, *Federal Practice and Procedure,* Section 2948 (1973). The four most important facts that have been found useful in deciding whether to grant or deny preliminary injunctions are described by professors Wright and Miller as follows:

(i) The significance of the threat of irreparable harm to the plaintiff if the injunction is not granted;

(ii) The state of the balance between this harm and the injury that granting an injunction would inflict on defendant;

(iii) The probability that plaintiff will succeed on the merits; and

(iv) The public interest.

Each of these factors is discussed below.

14.(a) *Irreparable harm*—To this point defendants offer the case of *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). To view *Sampson* in proper perspective, it must be noted, as it was by the Supreme Court very early in its discussion of the irreparable injury issue, that the record indicated that no witnesses were heard concerning irreparable harm, that the plaintiff's complaint was not verified, and that the affidavits submitted to the district court did not touch in any way upon considerations relevant to irreparable injury. The case *sub judice* is clearly distinguishable factually in that a great deal of testimony was received demonstrating numerous examples of irreparable injury to these plaintiffs. In a footnote to its determination that the plaintiff's showing fell short of the type of irreparable injury necessary for injunctive relief, the Court expressed the following possible limitation upon the scope of its ruling:

We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury

might be found. [415 U.S. 61 at 92, Fn. 68, 94 S.Ct. 937 at 953]

The Court went on to say that external factors common to most discharged employees will not support a finding of irreparable injury, however severely they may affect a particular individual. "But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation." 415 U.S. 61 at 92, 94 S.Ct. 937 at 953. The Court emphasized that use of the injunctive power, when discharge of probationary employees was an issue, should be reserved. Clearly, the plaintiffs here have shown that they are much more than probationary employees.

■ The Supreme Court did not further expand nor define what extraordinary circumstances might justify a finding of irreparable injury. If the "common to most discharged employees" statement is interpreted as the prevailing standard by which to test the complaint of the aggrieved plaintiff, the door would be effectively closed on any demonstration of injury no matter how severe. This court concludes that the statement in *Sampson* is not one of general policy. In this court's opinion, the severe economic and emotional damages demonstrated by the plaintiffs qualifies as a genuinely extraordinary situation.[3]

Fortunately, however, it is not necessary for this court to bottom its conclusion that irreparable injury was shown on the extraordinary nature of the injuries demonstrated. Wright and Miller, *Federal Practice and Procedure*, Section 2948, at 440, states: "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court recognized that in their jobs citizens have a "property right" protected by procedural due process to which an individual has a "legitimate claim of entitlement."

. . . It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

In the Court's most recent application of the *Roth* entitlement doctrine, it noted that the Lloyd-LaFollette Act did create in Civil Service employees a statutory expectancy which could amount to a constitutionally protected property interest. *Arnett v. Kennedy*, 416 U.S. 134, 94 S. Ct. 1633, 40 L.Ed.2d 15 (1974). While the plaintiffs claim the protection of the Lloyd-LaFollette Act, they also enjoy the entitlement benefits from other sources too numerous to set out fully here. The primary source securing the plaintiffs' claims of entitlement in the present case is regulatory: Federal Personnel Manual (FPM), Chapter 351. FPM 351 defines the retention rights of federal employees, including the right to displace other employees in the same subgroup ("retreat" rights), or in different subgroups ("bump" rights), who possess less tenure, or no veterans preference. *See* e. g., FPM 351.5–2, 351.7–4, 351.7–5.

---

3. The plaintiffs have demonstrated that their rights to recover back pay, severance pay, or other lump-sum award of damages at some later date (1) will not be available to all discharged employees, and (2) neither will it fully compensate them for low-cost group life insurance or "save pay" rights lost by separation from service, or for loss of broad-form medical-hospital insurance. Evidence was also presented of further intangible difficulties which will be incurred by the plaintiffs.

Read together, the safeguards and standards established by FPM 351 establish protections against unwarranted release from federal service, or significant reductions in job classifications and pay scales, for federal employees who possess the greatest number of relevant factors (e. g., tenure group, tenure subgroup, length of service, performance rating, retention standing within competitive level). *See* FPM 351.4, 351.5.

The safeguards established by FPM 351 have been abrogated or frustrated by the SETAC contract which BMDSCOM entered into with Teledyne-Brown Engineering Company. That contract has the effect of denying members of the plaintiffs' alleged class the right to "bump" or "retreat" into job positions which are presently performed by the personnel of that private contractor.

The Fifth Circuit held last year in the case of *Young v. United States*, 498 F.2d 1211 (5th Cir. 1974), that a federal employee could invoke the Administrative Procedure Act to secure review of his separation from federal service in violation of Army and Air Force regulations pertaining to "Exchange Service Personnel Policies." In the words of that opinion, the safeguards and standards established by the regulations involved there created in the plaintiff a legitimate claim of entitlement to continuation in his position with the Army/Air Force Exchange Service. The court stated:

> The plaintiff's interest in continuation in his position with the Exchange Service is characterized by those same "attributes of 'property' interests protected by procedural due process" described in Mr. Justice Stewart's opinion for the Court in *Board of Regents v. Roth* [cite omitted].

[*See* quote from *Roth* set out above.]

■ The court concludes that the constitutional claims of a protected "property right" establish the required showing of irreparable injury recognized by Wright and Miller.

14.(b) *Balance of hardship*—The second factor bearing on the court's exercise of its discretion involves an evaluation of the severity of the impact on the defendants should the preliminary injunction be granted, as balanced against the hardship that would occur to plaintiff if the injunction should be denied.

■■ Defendants' only contention in this regard is that it will cost them "in excess of $10,000 per day," to retain plaintiffs in their present positions. However, as plaintiffs' counsel observed during oral argument, this court may take judicial notice of the fact that Congress appropriated funds for all BMDSCOM employees (including all members of the plaintiffs' class) for the entire 1974–75 fiscal year. Thus, retention of the plaintiffs in their present positions pending final hearing on the merits will entail no immediate financial harm to the defendants or the United States' taxpayers; funds sufficient to pay plaintiffs' salaries have been authorized and appropriated for the remainder of the fiscal year. Significantly, defendants introduced no evidence to the contrary. The court, as stated in the findings of fact, has been offered no evidence to support defendants' contentions that national security will be damaged by the relief hereby ordered.

■ On the other hand, much evidence was received demonstrating that plaintiffs stand to lose substantial rights if injunctive relief is not granted. In addition to the factors discussed in the previous numbered paragraph on irreparable harm, the court takes judicial notice of the fact that even one day's break in the federal service of a civilian employee will entail the loss of a significant financial cushion—those salary retention rights popularly known as the "save pay" provisions. *See* FPM Supp. 990–2, subchapter S–5 (salary retention). When the foregoing factors are placed on the scales, it is clear that plaintiffs stand to be damaged far more by a denial of injunctive relief than defendants by granting it.

■ 14.(c) *Probability of success on the merits*—The third factor bearing on the court's exercise of its

discretion is a consideration of the likelihood that plaintiffs will prevail on the merits. This requirement does not mean that a plaintiff must establish during a preliminary hearing held only a few days after the institution of suit, without the benefit of discovery, that no doubt exists as to the ultimate resolution of the merits. Rather, as professors Wright and Miller have observed, "[a]ll courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." Wright and Miller, Section 2948 at 452. Moreover, the relative degree of likelihood of success is not alone determinative. "Rather, it must be considered and balanced with the comparative injuries of the parties." *Id.*, at 453. In this regard, plaintiffs have effectively demonstrated both (1) that the balance of hardships tips decidedly toward them, and (2) as stated in the findings of fact, that serious and substantial questions exist as to the defendants' compliance with various regulations in conjunction with the execution, reevaluation, and reexecution of the SETAC contract. The court concludes that plaintiffs have established a prima facie case justifying a more deliberate investigation into the merits of their claims.

14.(d) *Public interest*—The final factor bearing on the court's discretion to issue or deny a preliminary injunction is the public interest. Professors Wright and Miller write that "[f]ocusing on this factor is another way of inquiring whether there are policy considerations that bear on whether the order should issue." *Id.* at 457. It is significant that the only contention made by defendants in this regard is contained in an inadmissible affidavit executed by an unidentified army officer to the effect that enjoining the BMDSCOM reorganization will jeopardize national security. This is a serious allegation and, if true, certainly merited elaboration. However, despite ample opportunity and unquestioned expertise to speak to the point, defendants offered no testimony. On the other hand, plaintiffs approached the question directly and offered persuasive testimony that retention of plaintiffs in their present positions pending final hearing on the merits neither will jeopardize national security nor disrupt the BMDSCOM mission.

▮ Furthermore, there is a strong public interest in requiring government agencies to observe their own regulations.

I conclude that there are no considerations of public interest that mitigate against injunction.

A preliminary injunction in form appropriate to these findings and conclusions will issue forthwith.

### ORDER

This cause came on to be heard upon plaintiffs' motion for preliminary injunction and defendants' motion to dismiss. In conformity with the Findings of Fact and Conclusions of Law entered contemporaneously herewith, the court grants the motion for preliminary injunction and denies the motion to dismiss.

Accordingly, it is ordered, adjudged and decreed that plaintiffs' motion for preliminary injunction be and same is hereby granted in the following respects:

(1) Defendants, either jointly or severally, or through their agents, servants, officers, employees and attorneys, or through any persons in active concert with them, are enjoined from directly or indirectly terminating, downgrading in pay, requiring the retirement of, or reassigning any members of plaintiffs' proposed class in accomplishment of the proposed reorganization of BMDSCOM which was to take effect on or about May 23, 1975.

(2) Defendants are not enjoined from effectuating the reorganization of BMDSCOM so long as such actions do not conflict with the order of this court as set out in paragraph (1) above. The court hereby ORDERS that the portion of its Temporary Restraining Or-

der of May 23, 1975, (paragraph number 3) restraining all actions of reorganization of BMDSCOM, not inconsistent with this order, be and same is hereby withdrawn.

The court further orders that, in accordance with its order of May 30, 1975, if a member of plaintiffs' proposed class feels that he is not being adversely affected by the reorganization of BMDSCOM, then such person shall have the right to "opt out" of plaintiffs' class and therefore not be affected by this order. The court is aware that several persons have already so "opted out." Upon receipt by this court of any letter from a member of the proposed class, indicating a desire to be reclassified from the effect of this court's order and addressed to Honorable J. Foy Guin, Jr., United States District Judge, c/o Deputy Clerk Gene Bell, Room 104, Federal Building, Birmingham, Alabama 35203, the person sending said letter shall no longer be considered as a member of said class and in no way be affected by the preliminary injunction ordered this date.